(Decided November 16th, 1904.)

---

# NATIONAL BANK OF BRISTOL *vs.* BALTIMORE AND OHIO RAILROAD.

*Rights of Assignee of Non-Negotiable Bill of Lading—Purchase in Good Faith From Party Who Obtained the Goods by Fraud—Evidence—Instructions.*

When there is no evidence to the contrary it will be presumed that the common law prevails in another State of the Union.

At common law a bill of lading was a negotiable instrument in only a qualified decree, and even that negotiability could be taken away by writing upon the face of the instrument the words "Not negotiable."

A non-negotiable bill of lading may be assigned like any other chose in action, and the assignee takes it, and the property represented by it, subject to the equities between the original parties of which he has notice.

A bill of lading represents the goods described in it and the indorsement and delivery of the bill by the holder to a *bona fide* purchaser for value divests the lien of the seller against the holder for the price, and his right, upon rescinding the sale for fraud, to retake the property.

When the buyer of goods on credit obtains possession and ships them by a common carrier, receiving a non-negotiable bill of lading to his order the party to whom he transfers that bill of lading, who takes the same *bona fide* and for value, acquires a valid title to the goods although the buyer may have obtained them by fraud or shipped them in violation of his agreement with the seller, since the bill of lading represents the property described in it.

.A sold and delivered a quantity of lumber in Virginia to DeC who loaded it on a car. A alleged that the agreement was that the lumber was to remain his property until a post dated check on a bank at another place which DeC gave for it was paid. DeC shipped the car and received a bill of lading, marked across its face "non-negotiable" in his own name. He then obtained from the plaintiff bank the discount of the draft on a party in Baltimore, with the bill of lading attached thereto as collateral and endorsed by him. DeC represented to the bank that he was the owner of the lumber and it was on the faith of the bill of lading in his name that the bank discounted his draft. DeC drew out the proceeds of the discount and afterwards the draft was returned unpaid, together with the bill of lading. The check given by DeC to A, the seller, was not paid and the latter came to Baltimore and obtained possession of the carload from the Railroad Company after giving it a bond of indemnity. Then the bank holding the bill of lading after making a demand for the lumber, brought this action against the Railroad Company. *Held*, that the bill of lading contained nothing to put the bank upon inquiry as to whether other persons than DeC had any rights in the property; that evidence was admissible to show that A had sold and delivered the lumber to DeC and accepted his check in payment; that if the bank was the *bona fide* purchaser or pledgee of the lumber from DeC its right thereto is superior to that of the vendor, whether the title was acquired by DeC by fraud or not, and that since A's delivery of the lumber to DeC enabled him to deal with it as his property the loss in this case must fall upon A.

A prayer is erroneous which does not submit to the finding of the jury certain facts of which there is evidence which, if found to be true, would authorize a conclusion different from that which the prayer requires the jury to find.

Appeal from the Superior Court of Baltimore City (WICKES, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE and SCHMUCKER, JJ.

*Francis E. Pegram* and *Edwin T. Dickerson*, for the appellant.

1. The whole testimony in this case indicates a sale by Atkins Bros. to DeCamp. The lumber was delivered to the carrier on November 7th, on the same day DeCamp's check, post dated November 8th, was accepted in settlement, and was held until the 10th before it was deposited ; on the same day the siding on which the car had stood when loaded three

days before, was passed by a member of the firm (the one who made the sale to DeCamp), and no notice was taken to see whether or not the car was still there, and not until several days thereafter, when DeCamp's draft to their order was re-·turned unpaid, did Atkins Bros. give themselves any concern as to the whereabouts of the car, when, for the first time, they had any communication with the agent of the carrier by whom the car was billed ; they claim that they then for the first time sought to discover the location of the car of lumber; all of which facts are inconsistent with any intention on the part of Atkins Bros. to retain the title to the lumber in themselves. (*Phosphate Co.* v. *Gill*, 69 Md. 537.) In support of this view, is their letter of several days thereafter to the appellant, stating that they had *sold* the lumber to DeCamp, and their letter on the day following to the appellant's agents in Baltimore, not only reiterated that they had sold the lumber to DeCamp, but that they had shipped the same to him at Locust Point, Baltimore. "There can be no stronger evidence against a man than his own admissions." *Dorn* v. *Bayer*, 16 Md. 144, 153. If there was a sale by Atkins Bros. to DeCamp, then no matter what the conditions were, on which it was made, or by what fraud of DeCamp's it was induced, the title of the appellant, who has given value, relying on the *bona fides* of De-Camp's title, is unimpeachable. *Dold Packing Co.* v. *Ober*, 71 Md. 150; *Hall* v. *Hinks*, 21 Md. 406, 417; *Lincoln* v. *Quynn*, 68 Md. 299, 304.

When Atkins Bros. sold the lumber to DeCamp, loaded it on a car, and received and accepted from him in payment, a draft for the purchase-money, the title to said lumber passed from Atkins Bros. to DeCamp, and while so in possession, and clothed with all the *indicia* of ostensible ownership, having procured from the Norfolk and Western R. R. Co., the order bill of lading, and assigned the same to the appellant, which took it for value, *bona fide*, and in the usual course of business, his failure to pay said draft cannot affect the appellant's title. *Hall* v. *Richardson*, 16 Md. 396; *Merrick* v. *Bradley*, 19 Md. 50; *Allen* v. *Maury*, 66 Ala. 10.

It is settled law, that if the owner, although induced thereto by fraud, invests another with the apparent legal title to chattels, in pursuance of a contract, the person so clothed may transfer an unimpeachable title to a good faith purchaser. *Moore* v. *Moore*, 112 Ind. 149, 151–153.

In the case just cited, the payee of certain promissory notes, secured by mortgage, was induced by fraud and false representations to endorse and deliver the same together with the mortgage. The fraudulent endorsee, long after the maturity of the notes, transferred the same to a *bona fide* purchaser for value, who took without notice or knowledge of the fraud. Upon a bill being filed by him to foreclose the mortgage, the payee in the notes filed a petition asking the Court to enjoin the plaintiff from claiming any interest in the notes or in the decree of foreclosure. The Court dismissed the petition, saying: "The argument for reversal rests mainly on the proposition that the assignee of a non-negotiable instrument can take no greater interest or better title to the instrument assigned than was possessed by the assignor at the time of assignment; hence, the argument proceeds, the notes in suits having been transferred to the appellee after they had matured and were dishonored, the latter took them subject not only to all defenses and equities between the original parties, but subject also to all equities in favor of the appellant, a prior indorser. In short, the appellee's position is that a 'purchaser of a chose in action must always abide by the case of the person from whom he buys.' " "As applied to instruments or things in action, the legal title to which is transferable by assignment in writing, the doctrine relied upon has been distinctly and repeatedly repudiated by the more recent decisions in New York, as, also, in other jurisdictions." *McNeil* v. *Tenth National Bank*, 46 N. Y. 325; *Moore* v. *Met. Nat. Bank*, 55 N. Y. 41; *Trustees, etc.,* v. *Wheeler*, 61 N. Y. 88, 104; *Davis* v. *Bechstein*, 69 N. Y. 440. "Whatever right remains in the assignor of the instrument, thus assignable, after the holder has transferred it by an unrestricted endorsement, must of necessity be of a purely equitable character. It is not perceived, there-

fore, why an innocent purchaser, who takes such an instrument for value and without notice of the latent equities of prior endorsers, may not stand upon the rule that where the equities are equal, he is in the situation of advantage who holds the legal title. "If one of two equally innocent parties must suffer that one, who by his endorsement of the instrument has conferred upon another the apparently absolute ownership of the paper must bear the loss."

We are unable to discover any good reason for a distinction in that regard between chattels and such instruments as may be assigned by endorsement, so as to give the assignee a complete legal title." "The more modern rule upon the subject under consideration seems to be, that where the owner of things in action, although not technically negotiable, has clothed another, to whom they are delivered in the method common to all mercantile communities, with the usual apparent *indicia* of title, he will be estopped from setting up against a second assignee, to whom the securities have been transferred for value and without notice, that the title of the first assignee was not perfect and absolute." 2 *Pomeroy Eq. Jur.*, sec. 710; *Pomeroy on Remedies*, sec. 161; *Combes* v. *Chandler*, 33 O. St. 178; *Burton's Appeal*, 93 Pa. St. 214; *Wood's Appeal*, 92 Pa. St. 379.

When the appellant discounted the draft for DeCamp in the regular course of its business, and took as security therefor an assignment of the bill of lading, it acquired an indefeasible title to said lumber and became the *bona fide* purchaser thereof. *Hall* v. *Hinks, supra; Tiedeman* v. *Knox*, 53 Md. 612.

Whatever rights of stoppage *in transitu* Atkins Bros. may have had against the lumber, while it was in the possession of DeCamp, they had no such right after he had assigned said bill of lading to the appellant for value. *Pease* v. *Gloahec*, L. R., 1 P. C. 219; *Coventry* v. *Gladstone*, L. R. 6 Eq. 44; *Winslow* v. *Norton*, 29 Me. 419, 421; *Morris* v. *Shryock*, 50 Miss. 590; *Rosenthal* v. *Dessau*, 11 Hun. (N. Y.) 49.

The fact of a sale by Atkins Bros. to DeCamp is a conceded element in the defendant's prayer, by which it asked the

Court to instruct the jury, that even if they found a sale from Atkins Bros. to DeCamp, that if they further found that the draft given in payment turned out to be worthless, they must find for the defendant, thereby entirely ignoring the means by which the plaintiff acquired its title. Their sole defense is that if DeCamp failed to pay for the lumber sold to him by Atkins Bros., the fact that the bill of lading was executed in Virginia and had the words "non-negotiable" printed on it, the appellant could acquire no title as against Atkins Bros., even though it took an assignment of said bill of lading in the usual course of business, and in ignorance of the fraud of DeCamp. The instruction granted segregated two words from the rest of the bill of lading, and utterly ignored the fact that it was drawn *to the order of* DeCamp, and in such form, enabled him to transfer to the appellant, by indorsement, the possession and an unimpeachable title to the lumber. *Gibson* v. *Stevens*, 8 Howard, 384. And the equitable interest of Atkins Bros. was not such as to authorize them to take the property out of the hands of the legal owner, until all its claims were discharged. (*Ib.*)

It utterly ignored the fact that by drawing the bill of lading *to the order of* DeCamp the Norfolk and Western R. R. Co. had destroyed the effect of the printed words "non-negotiable;" that the former must prevail over the latter, its effect being to make the title transferable. *Harper* v. *The Albany Mut. Ins. Co.*, 17 N. Y. 194; *Robertson* v. *French*, 1 East, 130, 136; *Coster* v. *The Phœnix Ins. Co.*, 2 Wash. C. C. 53.

Of what is the law of Virginia, as affecting the bills of lading, there is no evidence, and in its absence this Court will presume that the common law prevails, and will indulge in no presumptions respecting the statute law of that State. *State* v. *P. & C. R. R. Co.*, 45 Md. 41, 46; *Dickey* v. *Pocomoke City Bank*, 89 Md. 296; *Seldner* v. *Katz*, 96 Md. 212, 220. By the common law, the endorsement and delivery of the bill of lading transferred to the appellant the legal title and constructive possession of the lumber (*B. & O.* v. *Wilkens*, 44 Md. 11, 26; *Hopkins* v. *Cowen*, 90 Md. 152, 163), and hav-

ing the legal title the equity of the appellant must prevail over that of Atkins Bros.  *Moore* v. *Moore, supra.*

2. It appears from the letter from Atkins Bros., dated November 17th, 1902, that they shipped the lumber from Marion, Virginia, to Locust Point, Baltimore, to DeCamp; they, therefore, authorized the Norfolk and Western Maryland R. R. Co. issue the bill of lading to DeCamp, and that the agent of the Norfolk and Western R. R. Co., who billed the car, regarded DeCamp as the ostensible owner, and as such by the express or implied authority of Atkins Bros., issued to him the bill of lading to his order.  This vested in him, as against the Norfolk and Western R. R. Co. and its privies a transferable title to the lumber, and the appellee, which is in privity with the Norfolk and Western R. R. Co. is estopped from denying the title of the appellant, which has given value, relying on the faith of said bill of lading as security, and in ignorance of the claim of Atkins Bros.  *Gibson* v. *Stephens*, 8 Howard, 399; *Hale* v. *Milwaukee Dock Co.*, 29 Wis. 482; *Griswold* v. *Haven*, 25 N. Y. 95; *Planters' Rice Mill Co.* v. *Olmstead & Co.*, 78 Ga. 586.

3. The loss was unquestionably occasioned by the trust and confidence reposed by Atkins Bros. in DeCamp.  On November 7th, they loaded the lumber on a car of the Norfolk and Western R. R. Co., and accepted from him in payment a check post dated November 8th, *thereby giving him a credit of one day.*  During that period of credit DeCamp secured from the Norfolk and Western R. R. Co. a bill of lading in his own name, and offered his draft to the appellant for discount, with the bill of lading duly endorsed, as collateral, and the appellant, relying on the faith of the bill of lading, discounted his draft.  Nor did the appellant use due diligence in the collection of DeCamp's draft to their order.  They neither 'phoned nor telegraphed the bank on which it was drawn to know if it would be honored.  (They might have required of DeCamp a certified check.)  They did not even present the draft, post dated as it was, on the day it was dated, but held it over Sunday until Monday, the 10th of November,

before depositing it in their bank at Marion. They did not even request the bank at Marion to 'phone or telegraph the bank of Bristol, on which it was drawn, to know if it would be honored, but remained in a state of supine indifference until three or four days after the day the draft was deposited in the bank at Marion, and six or seven days after they had loaded the lumber on the car, when they learned that the draft had turned out to be worthless. Prior to that time they had not concerned themselves about the whereabouts of the car of lumber or what DeCamp had done with it. *Somes* v. *Brewer*, 2 Pick. 201; *Phelp's Juris. Eq.*, sec. 180.

*George P. Bagby* (with whom was *Charles T. Bagby* on the brief ), for the appellee.

There is only one point of law involved in this case. There are two bills of exception in the record, but they both involve the same controlling question, which is, was the bill of lading offered in evidence a negotiable or a non-negotiable paper ? If it was negotiable, the National Bank of Bristol being a *bona fide* holder of it for value, there can be no inquiry into equities between prior parties, and the appellant's first bill of exceptions should be sustained. If, on the other hand, the bill of lading was non-negotiable, then the appellant was a mere assignee of a non-negotiable paper and took its title subject to all equities between prior parties, and evidence of such equities was most pertinent; hence the ruling of the Court set out in the first bill of exceptions was correct. The second bill of exceptions involves the ruling of the trial Court in refusing the plaintiff's prayer and granting the defendant's, the former being based on the theory that the bill of lading was negotiable or quasi-negotiable, and the latter on the theory that it was non-negotiable.

The bill of lading has the words "not negotiable" printed in large type across its face, and these words conclusively distinguish this case from *Hall* v. *Hinks*, 21 Md. 406, relied upon by the appellant at the trial Court.

The bill of lading was executed in the State of Virginia, and

hence the Maryland statute (Code, 1903, Art. 14, sec. 2), declaring "Order" Bills of Lading to be negotiable, notwithstanding words to the contrary printed on the face thereof, has no application, as a bill of lading, like other contracts, must be interpreted and construed according to the *Lex loci contractus. Midland National Bank,* v. *Mo., etc., Railroad,* 132 Mo. 492; *Hazell* v. *C. M., etc., Railroad,* 82 Iowa, 477; *Liverpool Ship Co.* v. *Phœnix Ins. Co.,* 129 U. S. 397; *O'Regan* v. *Cunard,* 160 Mass. 356; *Thomas* v. *Wabash, etc., Railroad,* 63 Fed. 200; 5 *Am. & Eng. Enc. of Law* (2 ed.), 302 *et seq.; Minor on Conflict of Laws,* 405.    The case of *Hazell* v. *C. M., etc., Railroad, supra,* involved identically the same question as the case at bar.

In dealing with these words "not negotiable" on the bill of lading, if the contention of the appellant, namely that the bill of lading is negotiable in spite of these words, is to prevail, this Court must do one or two things, either first strike the words from the bill of lading, or what is the same thing, treat the bill of lading as if they were not there; or second, give to these words a meaning different from what they clearly appear to mean.    The first horn of the dilemma seems almost too clearly untenable for argument.    It is not the province of the Court to make a new contract for the parties, but to construe and apply the contract as the parties have made it for themselves.

The words "not negotiable" are simple, and can have one and only one meaning, and that a meaning with which the law is thoroughly familiar.    Surely it is within the power of the carrier to limit his responsibility to the named consignee only; if these words "not negotiable" printed on the face of the bill of lading do not accomplish that end, we would be at a loss to know how to bring it about.    The words are plain and unequivocal, and we respectfully submit that any attempt to give them any meaning other than what they plainly signify would be nothing more nor less than an indirect way of striking the words out of the contract or declaring them void.

And when it is noted that the words "not negotiable" ap-

pear immediately above the "surrender" clause, it is perfectly plain that the words "to the order of" are not used as words of negotiability, but (as per the "surrender" clause), denote that a surrender of the bill of lading properly endorsed, shall be required by the carrier before delivery.

Under this construction, the parts of the bill of lading, towit, the words "to the order of," the "surrender" clause, and the words "not negotiable," thoroughly harmonize, whereas it is impossible to construe the words "to the order of," to render the bill of lading negotiable without declaring them to be in *direct conflict with the words "not negotiable" printed plainly on the face of the bill of lading, and giving the former words the effect of overriding and nullifying the latter.* Moreover the words "to the order of" do not render bills of lading negotiable as they do bills and notes even when not qualified by the words "not negotiable." *Lazard* v. *M. & M. Trans. Co.,* 78 Md. 1.

In 21 *Am. & Eng. Enc. of Law* (2 ed.), 545, note 6, it is said: "If a common carrier desires to limit his responsibility to the named consignee alone, he must stamp his bills as non-negotiable, and where he does not do so, he must be understood to intend a possible transfer of the bills." See also *Colgate* v. *The Pennsylvania, Etc., Co.,* 102 N. Y. 120; *Prime* v. *South Branch Co.,* 20 Ill. App. 241; *Bank* v. *R. R. Co.,* 106 N. Y. 201.

Though the bill of lading here involved is not negotiable in any sense, it is like the ordinary contract, assignable, and when the appellant took the endorsement of it, it did not handle the bill of lading as a negotiable paper as it undertook to do, but in reality took an assignment of a non-negotiable instrument. The *bona fide* assignee for value of a non-negotiable instrument stands only in the shoes of his assignor and takes his title subject to equities between prior parties. That is to say, the appellant merely stands in DeCamp's shoes, and its title to the bill of lading is subject to the fraud between Atkins Brothers and DeCamp. *Jasper Trust Co.* v. *K. C. M. & B. R. R.,* 99 Ala. 422; *Randolph on Commercial Paper* (1900), (vol. 3) 2631; *Steele* v. *Sellman,* 79 Md. 6, and cases cited.

The words "not negotiable" printed on the face of the bill of lading refute the application of the doctrine that "if one of two innocent persons must suffer by a deceit, it is more consonant to reason that he who puts confidence in the deceiver should be the loser rather than a stranger." Indeed this doctrine could have no application to this case in any event. *B. & O. R. R. v. Wilkins*, 44 Md. 29; *DeCan v. Shipper*, 35 Pa. St. 239; *Evansville v. Erwin*, 84 Ind. 457; *National Bank of Commerce v. Chicago, etc., R. R.*, 9 L. R. A. 263; *Blossom v. Champion*, 37 Barb. (N. Y.) 554.

McSHERRY, C. J., delivered the opinion of the Court.

This is an appeal from a judgment rendered by the Superior Court of Baltimore City. An action of trover was instituted in that Court by the appellant, the National Bank, of Bristol, against the Baltimore and Ohio Railroad Company to recover the value of a car load of walnut lumber of which the appellant claimed to be the owner, and which it was alleged the appellee had converted to its own use. The declaration, which sets out at large the facts upon which the appellant relies to make out its case, need not be particularly alluded to inasmuch as no questions arise on the pleadings. The only matters with which we are concerned on this appeal are those presented by the two bills of exception contained in the record. The first bill of exception brings up a ruling of the Court on the admissibility of evidence, and the second concerns the action of the trial Court on the prayers for instructions to the jury.

There is some conflict in the evidence, but that is not of material consequence in dealing with the legal principles, which will control this controversy, because the facts must ultimately be found by the jury.

It appears that on the 7th day of November, 1902, a certain E. L. DeCamp, drew at Bristol, Tenn., a draft on Cameron & Company, 29 P. O. avenue, Baltimore, Maryland, payable to the order of John B. Baumgardner, cashier, for $400, which was cashed by the Bristol National Bank, and the proceeds

were carried on the books of that bank to the credit of the
drawer.   Attached to the draft was a bill of lading issued by
the Norfolk and Western Railway Company at Marion station,
Va., on November 7th, 1902, for the transportation of one
carload of walnut lumber in car No. 23914 shipped by E. L.
DeCamp, "Shipper as Owner" and consigned "To the order
of E. L. DeCamp, Locust Point." Upon the face of the bill
of lading there was printed in full faced type the words "*Not
Negotiable.*"   Immediately beneath these words appears the
following clause "If the word 'order' is written immediately
below or after the name of the party to whose order the prop-
erty is consigned, the surrender of the bill of lading properly
endorsed shall be required before the delivery of the property
at destination, as provided by section 9 of the conditions on
the back hereof." When the draft was discounted by the
bank in the regular course of business the bill of lading was
endorsed by DeCamp and attached thereto as collateral se-
curity, and the draft with the attached bill of lading was for-
warded for payment, but was returned to the appellant bank
in about five days protested for non-payment.   At the time
the draft was discounted for DeCamp he represented himself
to be the *bona fide* owner of the bill of lading and the lumber,
and it was solely on the faith and security of the bill of lading
that the discount was made.   Within five days after DeCamp
had been credited with the proceeds of the draft by the Bristol
bank, he checked out the funds.   After Cameron & Company
had refused to accept the bill of lading and pay the draft, and
after both had been returned to the bank on November 13th,
the bank forwarded the bill of lading to Price & Heald in Bal-
timore with instructions to receive the carload of walnut lum-
ber described in the bill of lading and to sell the same for ac-
count of the appellant bank.. Price & Heald on November
14th, exhibited to the Baltimore & Ohio Railroad Company
the bill of lading for the carload of walnut lumber, and de-
manded that the lumber be turned over to them, but the ap-
pellee declined to comply with that demand and delivered the
lumber to the agents of Atkins Brothers, who had given the

appellee a bond of indemnity, to secure the Railroad Company against loss by reason of the delivery of the lumber to Atkins Brothers.

The appellee then proved, after the Court had overruled an objection to the admissibility of the evidence, that the firm of Atkins Brothers, manufacturers of lumber at Attoway, Va., agreed to sell to E. L. DeCamp a carload of walnut lumber, they to load the same and to hold it until a check given to them by DeCamp on the appellant bank was paid.   The lumber, the same now in controversy, was to continue to remain the property of the vendors until the check was paid :   That there was not a sale but an agreement to sell, which DeCamp fully understood :   That DeCamp, without the authority, knowledge or consent of the vendors, shipped the car and procured the bill of lading to be made out in his own name :   That he did not assure the vendors that the check he gave them was good :   That when the check last alluded to was returned unpaid the vendors went to Baltimore, whither the lumber had been shipped, and reaching there before the car arrived, gave a bond of indemnity to the Railroad Company and secured the lumber which they sold through an agent :   That DeCamp gave the vendors a check in payment for the lumber on November 7th, but dated it the day following, and that the vendors deposited it in their bank on November 10th, for collection :   That Atkins Brothers made no effort to ascertain whether the check would be paid and that they made no arrangement with the railroad authorities that the car should remain on the siding, where it had been loaded, until they could hear from the check.   When the check was presented at the Bristol National Bank, DeCamp had no funds to his credit there, having withdrawn them about the 12th of November.   On November 18th, after the return of DeCamp's check to Atkins Brothers, the latter wrote to the appellant bank a letter in which they said, "Messrs. Price & Heald of Baltimore, Maryland, state that you have sent them bill of lading for car of lumber, N. & W. No. 23914 to sell for your account.   We would respectfully notify you that this car of

lumber belongs to us.    *We sold it* to Mr. E. L. DeCamp, in payment of which he gave his check and draft on your bank which you refused to honor claiming that DeCamp had no funds."

. To the admissibility of all of this evidence the plaintiff objected, but the Court·overruled the objection and thereupon the first exception was reserved.    We need not pause at this time to inquire whether the evidence objected to, and above set forth, was admissible, because in considering the action of the Court upon the prayers contained in the second bill of exception the propriety of the ruling made in the first exception will be necessarily involved.

In rebuttal the appellant produced ·a letter from Atkins Brothers dated November 17th, and addressed to Price & Heald, the agents of the appellant bank, in which the following statement is made: "On November 7th, *we shipped* from Marion, Va., to Locust Point Station, Baltimore, car of lumber, N. & W. No. 23914.    *We sold this car to E. L. DeCamp, shipped to him in Baltimore.*    He gave us in settlement his check for part and draft for balance.    The bank at Bristol reports no funds, consequently we wish to stop the payment of them by you to E. L. DeCamp."

Upon the close of the evidence each party presented one prayer; that of the appellant was rejected, whilst that of the ·appellee was granted.    These prayers will be found set forth in the margin. *

---

*Plaintiff's Prayer.*—If the jury find from the evidence that Messrs. Atkins Bros. sold and shipped to E. L. DeCamp at Baltimore, Md., a car-load of walnut lumber, as set out in the bill of lading offered in evidence, and received from said E. L. DeCamp his check and draft in settlement, then, notwithstanding said draft and check were not paid, a good title passed from Atkins Bros. to said DeCamp, which title passed to the plaintiff upon the endorsement of the bill of lading, and their verdict must be for the plaintiff.  (*Refused.*)

*Defendant's Prayer.*—The defendant prays the Court to instruct the jury that, even though they find that Atkins Bros. sold the lumber in controversy to DeCamp, and delivered same to the Norfolk and Western Railroad for transportation and delivery to DeCamp, or his order, yet, if they find that DeCamp obtained the title to and possession of said lumber by giving Atkins Bros. in payment thereof a draft which turned out

BANK OF BRISTOL vs. B. & O. R. CO.    675

Md.]                    Opinion of the Court.

The theory upon which the Court evidently acted in refusing the appellant's and in granting the appellee's prayer was, that the title of the bank to the lumber, and its right to maintain this action, depended wholly upon its ownership of the bill of lading, and as that instrument had stamped upon it the words "not negotiable" the bank did not stand in the situation of a *bona fide* endorsee of a negotiable security who took it for value before maturity without notice of any imperfections in its origin, and as Atkins Brothers had prior equities, the bank could not recover.

The bill of lading evidencing the contract between the shipper and the Railway Company was issued in Virginia and its qualities are such as the law of that State, and not the law of this State, impressed upon it.   There is no proof in the record as to what the law of Virginia is in this respect, and we must consequently presume that as to bills of lading the common law prevails there.   By the common law a bill of lading was not, in an unrestricted sense a negotiable instrument like a promissory note, but was as this Court has repeatedly stated *quasi* negotiable only.   *Baltimore and Ohio Railroad Company* v. *Wilkins*, 44 Md. 11.   But even that restricted common law negotiability may be limited and still further qualified by the insertion of appropriate terms wholly destroying all negotiability, and it seems to be generally agreed that such a result may be accomplished by simply stamping or printing across the face of the instrument the words "not negotiable," as was done in this instance.   21 *Am & Eng. Ency. of Law*, 2 ed. 545.   The non-negotiability of the bill of lading does not prevent it from being assignable.   Like any other non-negotiable instrument, or chose in action, it may be transferred

to be worthless, and that when Atkins Bros. learned that said draft was worthless, and before the defendant had delivered said lumber, Atkins Bros. demanded that the defendant turn over said lumber to them and that accordingly the defendant did turn over said lumber to Atkins Bros., their verdict must be for the defendant, provided the jury further find that the bill of lading filed with the declaration was executed in the State of Virginia, and that at the time DeCamp endorsed the bill of lading to the plaintiff, (if the jury find that it was so endorsed), it had the words "Not Negotiable" printed on its face.   (*Granted.*)

by assignment, and when thus dealt with the assignee takes a valid title to it subject, of course, to the equities existing between the original parties to it, of which, if there are any, he is held to have had notice. *Steele* v. *Sellman,* 79 Md. I. But what are the equities with which the assignee of a non-negotiable bill of lading in such a case as this is chargeable? Surely not the equities of third parties whose names do not appear upon and are in no way connected with the bill of lading. A bill of lading as a mere document is valueless. It is of consequence only in so far as it is the evidence of title to something in some body. Its transfer is the transfer of the title to the thing described in it, and whatever equities exist between the parties to it with respect to the title of the property which it purports to represent, will follow that property into the hands of the assignee of the bill of lading, unless some other legal or equitable principle intervenes to preclude the assertion of a prior right as against a *bona fide* assignee for value. ·

In the case at bar the name of Atkins Brothers does not appear upon the bill of lading at all. DeCamp was the ostensible owner and the actual shipper of the lumber and he was also the consignee. Nothing was disclosed on the face of the instrument to indicate that any other person than DeCamp had any right to or claim upon the lumber, and there was absolutely no word, mark or sign to put the bank on inquiry as to DeCamp's ownership or to suggest even a suspicion that some one else had a superior right to the property. When there is a collateral fact, which is known to an assignee of a chose in action and which if followed would result in revealing the existence of the ultimate fact sought to be established then knowledge of such collateral fact will be held equivalent to notice of the ultimate fact and will bind the party to be affected as conclusively as though actual knowledge of the ultimate fact had been brought home to him. But the bill of lading contains no entry which could possibly have induced the bank to conjecture that DeCamp was not the exclusive owner of the lumber. Any inquiry it could have

BANK OF BRISTOL vs. B. & O. R. CO.      677

Md.]                    Opinion of the Court.

made would have been either from DeCamp or from the railroad agent who issued the bill of lading, and there is nothing in the record to intimate that the latter could have stated verbally anything different from that which the bill of lading discloses; whilst DeCamp in fact represented himself to be the owner of the lumber. No inquiry, therefore, on the part of the bank from either of the parties to the bill of lading would have disclosed anything beyond that which the bill of lading itself exhibited.

But if it were conceded that in spite of there being nothing on the face of the bill of lading to indicate that Atkins Brothers had sold the lumber to DeCamp and that the latter had not paid for it, and that because of these circumstances, the bank, though it did not know them, was none the less chargeable with knowledge of them, merely because the words "not negotiable" were endorsed upon the bill of lading; still there was evidence before the jury tending to show, if credited by them, such a state of facts as would preclude Atkins Brothers from asserting a title to the lumber as against the appellant bank. There was evidence as we have stated, particularly that furnished by the letters from which extracts have been quoted, tending to show that Atkins Brothers had *sold* this lumber to DeCamp ; had *loaded* it on a car for him; had *shipped* it to Baltimore and had received and accepted from him a check for the purchase price, dated one day after the actual sale. This evidence, if believed by the jury, would enable them to conclude that there had been a sale of the lumber on credit and a delivery of it to the common carrier, which was a delivery to the vendee, and therefore, that the title had passed from Atkins Brothers to DeCamp. *Hall* v. *Richardson*, 16 Md. 396. If the jury believed, from the evidence, that there had been a sale and delivery of the lumber to DeCamp, then the latter was authorized to procure the bill of lading in his own name as shipper and owner and a subsequent failure to pay the vendors the price he agreed to pay did not divest the title thus acquired. Bearing in mind that we are dealing with a bill of lading that is only assignable and not negotiable, according to

the terms contained upon its face, when DeCamp came into possession of that muniment of title and assigned it to the bank the latter acquired by the assignment precisely the title which DeCamp on that day himself had.

A bill of lading represents the goods described in it. 6 *Cyc.* 426. Bills of lading by the law merchant are representatives of the property for which they have been given, and the endorsement and delivery of a bill of lading transfers the property from the vendor to the vendee; is a complete legal delivery of the goods, *divests the vendor's lien.*  * * *  But though the vendor's lien is thus divested by reason of the complete delivery of the *indicia* of property, he may, if the goods have not yet reached the actual possession of the buyer, *and if no third person has acquired rights by obtaining a transfer of the bill of lading from the buyer,* intercept the goods in the event of the buyer's insolvency before payment, by the exercise of the right of stoppage *in transitu.*  These principles in relation to the effect of a bill of lading were first conclusively established in the great leading case of *Lickbarrow* v *Mason,* 2 T. R. 63; (1 *Smith Lead. Cases,* 753); 2 *Benj. on Sales,* sec. 1211.

In *Midland National Bank* v. *Mo.*, *Kan. & Texas R. R. Co.,* 62 Mo. App. 531, the following facts appeared.    Prior to October 28th, 1891, the Currier Commission Company was engaged in the grain and Commission business in Kansas City, Missouri.    It did its banking business with the Midland National Bank of that place, and had done so for several years. The Commission Company not having sufficient funds of its own to carry on business to its satisfaction arranged with the bank for accommodations, which were represented by notes and overdrafts, and it was a part of the agreement for credit, by which the amount of the indebtedness of the Commission Company to the bank should be secured, that the company would pledge all original shippers' bills of lading and elevator receipts.    During the months of July, August and September, 1891, one Follansbee, a purchasing agent of the Currier Commission Company, shipped at different times from Bur-

lington, Kansas, over the Missouri, Kansas and Texas Rail-road three cars of corn and two of flax seed. The former were consigned to Kansas City "shipper's order" with instruc-tions to notify Currier Commission Company, Kansas City ; and the latter were consigned to Chicago, "shipper's order, notify Currier Commission Company," and so the bills of lad-ing were made out. In payment Follansbee drew his drafts on the Currier Commission Company and attached to each draft the proper bill of lading. When the drafts and bills of lading made their appearance in Kansas City, the Currier Commission Company paid them by its checks on the Midland Bank and then placed those bills of lading with the bank to be held as collateral. When the five carloads of corn and seed reached Kansas City the Railroad Company delivered the same to the Currier Commission Company, or, which was the same thing, at Currier's request, re-billed them to other points, without the production or surrender of the bills of lading. On October 28th, the Currier Company failed in business and at the time owed the plaintiff bank in excess of the collaterals. Thereupon the bank demanded the grain and seed called for by the bills of lading, but the Railroad Company was, of course, unable to produce them because they had already been re-billed to other parties. Suit was then brought by the bank against the Railroad Company. The bills of lading had stamped on their face the words "*Not negotiable.*" The Court said : "When Follansbee, the shipper, indorsed and delivered the bills of lading to the Currier Commission Company, it be-came the owner thereof, with full power of disposition ; and, while so the owner, it had the absolute right, by the transfer of those bills of lading, to convey its title to the plaintiff bank. And this was done ; the delivery of the bills of lading to the bank effected a pledge of the property, to the same extent and with the same validity as if it had been actually delivered. The bills of lading were symbols of the grain—represented it—and their transfer by delivery stood as an actual change in the possession of the grain itself. The plaintiff bank held the property as collateral security for the advances made to the

Currier Company; and so far as it was necessary to the holder's self-protection, plaintiff had the legal title and was vested with all the rights and remedies of a purchaser for value. *Porter on Bills of Lading*, sec. 510 *et seq.*; *Hutch. on Carriers*, sec. 129; *Dymock* v. *R. R.*, 54 Mo. App. 400.   The words "Not negotiable" stamped on the face of the bills of lading, in no wise destroyed their assignability.    The sole effect of these words was to exempt such bills of lading from the provisions of our statute in relation thereto.    *Sec. 745, R. S. 1889; Dymock* v. *R. R.*, *supra*.   They are to be treated, then, as at common law."   It is said by the Supreme Court of Indiana in the case of *Moore* v. *Moore and others*, 112 Ind. 152, to be familiar law "that if the owner although induced thereto by fraud invests another with the apparent legal title to the chattels in pursuance of a contract, the person so clothed may transfer an unimpeachable title to a good faith purchaser." The same Court in the case above cited stated further, "We are unable to discover any good reason for a distinction in that regard between chattels and such instruments as may be assigned by endorsement so as to give the assignee a complete legal title.   The more modern rule upon the subject under consideration seems to be, that where the owner of things in action, although not technically negotiable, has clothed another to whom they are delivered in the method common to all mercantile communities with the usual apparent *indicia* of title, he will be estopped from setting up against a second assignee to whom the securities have been transferred for value and without notice, that the title of the first assignee was not perfect and absolute.   2 *Pomeroy's Eq.*, sec. 710; *Burton Bill*, 93 Pa. St. 214."

We have said that the bank acquired by the assignment of the bill of lading precisely the title that DeCamp had to the lumber on the day the transfer was made.   But it is insisted that DeCamp obtained possession of the lumber by fraud and therefore that he got no title to it at all and consequently could give none to the bank.   If it be conceded that he did secure the lumber by fraud, still if the bank was ignorant of

the fraud and took the bill of lading in good faith and for value it acquired an unassailable title, even as against the defrauded vendor. That proposition has been distinctly settled in *Hall* v. *Hinks et al.*, 21 Md. 417. It is there said: "All the authorities agree that although as between the original parties a sale and delivery of goods obtained by fraud, is void, (voidable) and may be rescinded at the election of the vendor, and the property reclaimed from the fraudulent vendee; yet, if they have passed into the hands of a *bona fide* purchaser without notice, he takes a good title, which cannot be impeached by the defrauded vendor. It is not necessary to cite authorities in support of this proposition, we have said there is no conflict upon this question and the principle has been recognized by the Court of Appeals expressly in *Powell* v. *Bradlee*, 9 G. & J. 221, and incidentally in *Ratcliff* v. *Sangston*, 18 Md. 390."

The principle which lies at the root of this doctrine is a very familiar one. It is a general and just rule that when a loss has happened which must fall upon one of two innocent persons, it must be borne by him who has occasioned the loss, even without any positive fault committed by him, but more especially, if there has been any carelessless on his part which has caused or contributed to the misfortune. *Somes* v. *Brewer*, 2 Pick. 190. An illustration of the application of this doctrine is found in *Eversole* v. *Maull*, 50 Md. 95, and *Diaz* v. *Chickering*, 64 Md. 349. If the jury should believe that the bank acted in good faith in discounting the draft for DeCamp and accepting the bill of lading as collateral security, and if Atkins Brothers by putting it in the power of DeCamp to deal with the property as his own enabled him to mislead the bank, and if in consequence of their confidence in him and the credit of one day which they gave him a loss must fall either upon the bank or upon them, then, wholly aside from all questions respecting the negotiability of the bill of lading, the doctrine imposing the loss upon the persons by whose carelessless DeCamp was enabled to represent to the bank that the property was his, that loss thus occasioned by that

representation, must fall upon them.    There was no right of stoppage in *transitu* if the bank had acquired title to the lumber.

The prayer presented by the appellant was wrong because it ascribed to the bill of lading the characteristics of a negotiable instrument, whereas by its terms it was declared to be non-negotiable.   The prayer granted at the instance of the appellee was wrong because it denied a recovery on any ground, inasmuch as the bill of lading was declared to be non-negotiable.   The prayer in effect withdrew from the consideration of the jury all the facts relative to the acquisition of title to the lumber by the bank, because it made no reference to those facts at all.   In *Corbett* v. *Wolford*, 84 Md. 426, this Court said: "A prayer instructing the jury that the plaintiff is entitled to recover provided they find certain facts, withdraws from the jury the consideration of all facts other than those mentioned, and if from such excluded facts the jury would be justified in drawing a conclusion different from that which the prayer requires them to find, it is error to grant such a prayer."   The evidence excepted to in the first bill of exception was admissible for the reasons that we have heretofore given in dealing with the prayers.   Under the instruction granted, the jury returned a verdict for the defendant, the appellee, and a judgment was entered in its favor thereon, and from that judgment this appeal was taken.   For the error committed in granting the appellee's prayer the judgment must be reversed and a new trial will be awarded.

*Judgment reversed with costs above and*
*below and a new trial awarded.*

(Decided November 18th, 1904.)