## IRVING MILLER *vs.* MARGARET B. LEIB.

*Hypothetical Question to Medical Expert—Order of Production of Evidence—Action Against Physician for Negligence in Diagnosis and Treatment—Instructions to the Jury.*

A hypothetical question put to a medical expert must not only be based upon the facts in evidence, but must not give a false coloring to those facts by unduly emphasizing some of them or not mentioning others.

In an action against a medical man for ignorance and negligence in the diagnosis and treatment of plaintiff's broken hip, there was evidence that at the time of suffering the injury and afterwards, plaintiff had tuberculosis, and the evidence was to the effect that the treatment of a patient for a broken hip should be different if that patient also has tuberculosis from what it should be if the patient's general health is good. Under these circumstances, a hypothetical question to a medical expert as to the proper treatment for the surgical injury which fails to mention the tuberculosis of the patient is erroneous.

Evidence that a witness summoned a physician at a certain time by telephone and that he responded is admissible, although the witness did not recognize his voice, when it is shown that he did afterwards call in response to the summons.

It is within the discretion of the trial Court to allow a plaintiff to offer evidence in rebuttal which was properly admissible as evidence in chief.

Plaintiff, a woman sixty-one years old, fell and fractured a femur in November. The defendant, her family physician, was called in to treat her, and she was subsequently taken to his sanatorium. No operation on the broken hip was performed or directed by him, but plaintiff's leg was merely kept in position by sand bags and afterwards by a plaster cast and extension. She left defendant's sanatorium in the following February in a lame condition. Two weeks afterwards, she

called in a surgeon who performed an operation, removing
the broken end of the femur and making a new thigh joint
which gave her the use of the injured leg. In an action to
recover damages for the defendant's alleged negligence in his
treatment of the plaintiff, defendant's evidence was to the
effect that the plaintiff was at the time of the accident, and
afterwards, suffering from tuberculosis; that her temperature
rose to a dangerous point, and that it was not the proper
treatment to perform a surgical operation on her at that time.
*Held,* that an instruction authorizing a verdict for the plain-
tiff if the jury found that certain specified mistakes were
made by the defendant in his diagnosis of plaintiff's case, and
that there was a failure by him to exercise ordinary care and
skill in specified respects in his treatment, is erroneous, be-
cause it is silent as to the evidence concerning the tuberculous
condition of the plaintiff, and therefore withdrew from their
consideration that evidence.

*Held,* further, that a prayer instructing the jury that the plain-
tiff was entitled to recover if the defendant did not exercise
reasonable care and skill in ascertaining the nature of her in-
jury and in his treatment was not erroneous, when granted
in connection with another prayer instructing the jury not to
allow damages for such delay in defendant's treatment of
plaintiff's hip as resulted from his diagnosis that she was suf-
fering from tuberculosis.

*Decided January 13th, 1909.*


Appeal from the Baltimore City Court (NILES, J.), where
there was a judgment on verdict for the plaintiff for $2,000.


*Plaintiff's 2nd Prayer.*—If the jury find that the defendant
was a physician and surgeon, and that the plaintiff fell and
sustained a fracture of the neck of the femur, and that the
defendant was called upon to treat the plaintiff and undertook
to treat her, then it was the duty of the defendant to exercise
reasonable care and skill to ascertain the nature of the plain-
tiff's injury, and to use the proper treatment therefor. And
if the jury find that the defendant did not exercise reason-

able care and skill to ascertain the nature of the plaintiff's injury, and that by reason of his failure to exercise such reasonable care and skill, the defendant erroneously concluded that the plaintiff had not sustained any fracture, and by reason of such error failed to give the plaintiff reasonably careful and skilful attention and treatment for such fracture, or if the jury find that the defendant did ascertain that the plaintiff had sustained a fracture of the neck of the femur, and shall further find that the defendant did not exercise reasonable care and skill in his attention and treatment therefor; and if the jury further find that, at the defendant's suggestion, the plaintiff was removed to his private sanatorium, and that there the defendant continued to treat her for a long time, and that after long treatment by the defendant, the plaintiff remained entirely without any use of her said limb, and continued in that condition until subsequently relieved by the proper treatment from another physician; and if the jury further find that by reason of said failure on the part of the defendant to exercise reasonable care and skill in ascertaining from what the plaintiff was suffering or in applying the proper treatment therefor, the plaintiff has suffered pain and loss of the use of her limb which she would not have suffered if the defendant had exercised such reasonable care and skill, then the verdict of the jury should be for the plaintiff. (*Granted.*)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, WORTHINGTON and HENRY, JJ.

*William Colton* and *Vernon Cook* (with whom were *Gans & Haman* on the brief), for the appellant.

*S. S. Field* (with whom were *Gill & Preston* on the brief), for the appellee.

SCHMUCKER, J., delivered the opinion of the Court.

This is an appeal from a judgment of the Baltimore City Court recovered by the appellee against the appellant, her family physician, for alleged negligence in treating her when ill. There is evidence in the record tending to show the following state of facts:

The appellee, Mrs. Leib, a widow of slender build, sixty-one years old, fell and fractured a femur while walking across her bed room at noon of Saturday November 19th, 1905. She was then residing with her adopted sister, Mrs. Burke, at Irvington, a suburb of Baltimore City, distant three-quarters of an hour to an hour from the office and sanitarium, of the appellant Dr. Miller, in the City.

At about one o'clock Mrs. Burke's daughter called up Dr. Miller's office on the telephone and mentioned Mrs. Leib's accident and requested him to come to see her. Some one, who said that he was Dr. Miller, answered the call, saying that he could not come at once but promising to come, as requested, after he closed his office. Miss Burke was unacquainted with the doctor and therefore could not identify as his the voice which answered her over the telephone. The doctor not appearing soon, Mrs. Burke, who knew him, called him up over the phone at seven o'clock in the evening and received a reply, which she recognized as being in his voice, promising to come as soon as his office hour was over. He arrived at Mrs. Burke's after nine o'clock and proceeded to make a physical examination of Mrs Leib.

The evidence as to the nature and extent of this examination is conflicting. Of those who witnessed it, Mrs. Burke thought it was brief and casual, her son Wm. B. Burke thought it was pretty thorough, his wife said that the doctor made no other examination than to bare the patient's leg to the hip and pull and twist it and then told her to lie perfectly quiet and rest, that quiet and rest were what she needed. The plaintiff's own account is as follows: "I told him how I suffered; he took my clothing off and examined my foot and did this way and this way (very gently); he examined

it, I suppose, for about ten or fifteen minutes, and then said, you have ruptured a muscle. I said, doctor it hurts me so dreadfully, and he said, you have ruptured a muscle and it is the most intense agony there is, but nothing very serious, and that after a few days it would heal if I would lie quiet. He fixed me and put his hand on the bed and said, lie quiet, you don't need any medicine or attention, but lie quiet." Dr. Miller on the contrary testified that he gave the patient a very careful and thorough examination, stripping, and comparing and measuring her limbs according to the usual methods and moving and handling the injured one as far as desirable and found neither shortening nor eversion of it, and that it was impossible to tell at that time whether the thigh was fractured or not. He said that in either event the proper treatment was that which he prescribed, of keeping the leg quiet and in line. He put a pillow at her foot and told her to keep in position the salt bags which had been put on the outside of her hip before his arrival.

The doctor did not see Mrs. Leib again until Monday evening when he prescribed the use of sand bags to keep her injured leg in a straight position and quiet and also gave her a sedative medicine internally. He came to see her again on Thursday and after re-examining her physically proposed to her to be removed to his sanitarium in Baltimore City at his residence where he said she could receive better attention. She assented to the proposition and on the following day was taken to the sanitarium where she remained under the doctor's care from November 24th to February 21st, when she left it in a lame condition with her fractured femur still ununited. While she was at the sanitarum she was kept in bed in a room with open windows and her leg was held in a position by the use of sand bags. Two efforts were made to treat the leg surgically, first, by the application of a side fixation splint and extension, and afterwards by a plaster cast and extension but she was unable to endure either of them. According to Dr. Miller's uncontradicted testimony her temperature went up to 105 degrees within forty-eight hours

after the application of the splint and he considered her desperately ill and took off the splint and lightened the extension weight. After her general condition had improved the plaster cast and extension were put on her and retained in position for seventeen or eighteen days, during all of which time she was uncomfortable and constantly begged for their removal and her general condition became so bad that the appliances were taken off. Dr. Miller paid her one visit after she left his sanitarium.

About two weeks thereafter Mrs. Leib called in Dr. Finney, a distinguished surgeon, who performed an operation on her, removing the broken end of the femur and making a new thigh joint. Since recovering from that operation she has enjoyed a fair use of the injured leg, but as it was somewhat shortened by the operation she will always be somewhat lame.

There is much testimony in the record tending to show that Mrs. Leib had been suffering from tuberculosis for some years prior to her accident and that the disease became acute after the accident. She said that Dr. Miller had been her regular physician ever since 1894, and he testified that he had on two occasions attended her for attacks of hemorrhages from the lungs, the last being in December, 1904, when she had a quite severe attack, that when he saw her the second time at Mrs. Burke's after the accident her cough was decidedly worse and her temperature 103, that she had bronchial pneumonia in both lungs when she arrived at his sanitarium and that while she was there he had frequent examinations of her sputum made and found it filled with tubercular bacilli and he was compelled to report her case to the Health Board as tubercular. Miss Ford and Miss Haney, two of the nurses who attended her at the sanitarium, both testified that she told them that she had had consumption for twenty years and that her mother had died of it. The same witnesses testified that she had a very bad cough and profuse expectoration when she came to the sanitarium.

Dr. Miller further testified that at his second visit to Mrs. Leib after her accident he discovered that her femur had

been fractured, but that her general condition was such that he thought it inexpedient to attempt at once to apply splints or a. plaster cast to her for the relief of her leg.

As against this evidence Mrs. Leib's family and friends who had known her for some years and who visited her at the sanitarium testified that they regarded her general health, prior to the accident, good, and that her illness at the sanitaium was produced by the cold air and drafts in the room in which she was kept and the insufficient covering on her bed. Some of these witnesses also thought that the doctor had been brusque in manner and indifferent in his treatment of Mrs. Leib and that he displayed lack both of knowledge and skill in that connection failing to ascertain the true nature of her injury or to give her case intelligent or skilful attention.

We express no opinion upon the weight of the evidence in the case, that being a question for the jury. We have referred to portions of it merely as explanatory of our action upon the legal propositions presented by the case.

Twenty-five bills of exceptions appear in the record, the last one of them being to the Court's action on the prayers and the others to rulings on evidence. The first eighteen exceptions concern questions, mostly hypothetical, put to the plaintiff's expert witnesses, who were Dr. J. M. T. Finney and Dr. Wirt A. Duvall. Of those questions only four were put to Dr. Finney, of which three were hypothetical in character. Some of those questions were defective in form but, as the doctor's answers were not such as were calculated to injure the defendant the overruling of the defendant's objection to them did not constitute reversible error.

The general tenor of Dr. Duvall's answers to the hypothetical questions put to him was that a reasonably skilful physician ought to be able to discover, by a reasonably careful examination of a person of Mrs. Leib's age and build, who had suffered such an accident as happened to her, whether or not there was a fractured bone; and that if the examination left him in doubt he should employ the X-ray to clear up the doubt; and that if the presence of a fracture was disclosed the

patient should be promptly treated either by an operation or by the application of a splint and an extension or a plaster cast to the injured leg and its retention in place for several weeks.

The tenor of the testimony of the defendant's medical experts, Drs. John W. Chambers and Thomas McCrae, and his own testimony as an expert differed from that of the plaintiff's experts chiefly in the important particular of what was the proper treatment to be adopted in cases where the patient with the fractured leg was a lady sixty-one years of age *who had tubercular trouble.* In such cases both Dr. Chambers and Dr. Miller expressed the opinion that a prudent and careful surgeon would look first to the woman's general condition treating the fracture in the meantime in the simplest possible way by the use of pillows and sand bags; and that if, when later on an attempt was made to use splints and extensions or similar appliances on the fractured leg, the patient's temperature rose to 103 or 105 and she suffered from a strenuous cough and expectoration and was uncomfortable, her health should be the first object of care and the appliances removed and the injured limb become a matter of secondary consideration; and Dr. Finney upon cross-examination expressed substantially the same views, although he said that he saw no tubercular symptoms in the plaintiff when he performed the operation on her thigh. Dr. McCrae thought the proper treatment for persons with a fractured hip who also suffered from consumption was to give them an abundance of fresh air, food and generally good hygiene.

The hypothetical questions, by means of which the plaintiff's counsel elicited the expert testimony of Dr. Duvall over the defendant's objection, were predicated upon the assumption that at the time of the accident she was over sixty-one years old and slight in build but were silent as to her general health at the time and especially failed to mention or take into consideration any tubercular trouble on her part. For example, the question referred to in the thirteenth bill of exception was: "Suppose a lady sixty-one years of age, rather

slight, falls and sustains a fracture of the neck of the femur; suppose it were an impacted fracture; what would be the treatment which would be required on the part of a reasonably skilful physician using reasonable care?" The question referred to in the fourteenth bill of exceptions was: "How long usually would reasonable care require that the Hamilton and Long (splint) or the plaster cast and the mild extension should remain before the doctor took it off to examine the condition of the fracture?" The question referred to in the sixteenth exception was: "Suppose a lady sixty-one years of age fell and sustained an intra capsular fracture of the neck of the femur and called in her regular physician, how often would reasonable care require that he should see his patient after his first visit."

We think the defendant's exception to these and all similarly defective questions should have been sustained. Litigants in an action of law are entitled to the judgment of the jury upon all of the facts of the case. Therefore expert testimony on hypothetical questions, which substitutes inferences for facts, ought always to be received with caution. It is of the highest importance in admitting such evidence that care be taken to see that the hypothetical question put to the expert is not only based upon facts already in evidence, but that it is so framed as to fairly represent those facts and not give the situation a false color by the method of their statement. In some jurisdictions such questions are required to cover all undisputed facts material to the subject involved, but it has been held by this Court in several cases that it is not always necessary in framing a hypothetical question to be put to a medical expert to refer to all of the evidence upon the subject. *Williams* v. *State,* 64 Md. 384; *United Railways* v. *Seymour,* 92 Md. 431. It has, however, since those cases been held by us that it is faulty in framing a hypothetical question for a medical expert to give a wrong coloring to facts by isolating a particular fact and withholding other facts which bear directly upon the one so segregated. *The Berry Will Case,* 93 Md. 572.

In that case the objectionable paragraph in the hypothetical question was as follows: "The attack in his last illness took place while he was sitting in his library; he didn't say much, but looked up to the ceiling, saying, yes, yes, um, um, yes, yes, um, um; and his servant being alarmed kept close so that she could reach him, if he attempted to rise, and send for a doctor. At this time the alleged testator said: 'I want to go to my chair;' and the servant said to him, 'you are in your chair;' and he replied to her, 'no I am not.' And she said to him 'do you want to go on the lounge;' and he said: 'yes;' and then she helped him to the lounge and when he got on the lounge he said, 'take me to my lounge.' She said, 'you are there now.' This was the very beginning of his sickness. Assume that the conduct of the alleged testator as just described was caused by the attack, and that he was not aware of the statement made in reference to his lounge and chair as herein mentioned." To this part of the hypothetical question the medical expert replied as follows: "From the description of that attack in your question I would suppose that was an attack of embolism of the brain." Another expert made this answer: "It indicates to my mind that degeneration, the physical and mental degeneration of the individual, caused the formation of an embolism or thrombosis in the brain and that produced an attack of delirium; and his saying yes, yes, yes, and um, um, um, is a characteristic of a man with brain trouble." We held the hypothetical question there to be bad because it entirely excluded the fact which has been testified to by the plaintiff's witnesses that the testator had long been in the habit of saying yes, yes, um, um.

In the present case, although the testimony of Dr. Miller and the two nurses as to the plaintiff's tubercular trouble had not been given when the hypothetical questions were put to Dr. Duvall she had herself testified that when she was at the sanitarium, Dr. Miller, who was her attending physician, had told her that she had tuberculosis so badly that, when she went away from the institution, everything in the room which she occupied would have to be burned. She had also testified

that when she was about to leave the sanitarium her nurse warned her to be careful because she had tuberculosis, but that she (the plaintiff) had heard it before from her niece. She had also admitted having twice been attended by Dr. Miller for attacks of hemorrhage from the lungs prior to the breaking of her hip.

Under these circumstances the entire suppresion of the existence of the plaintiff's tubercular trouble in the hypothetical questions to which we have referred, put to her medical expert for the purpose of proving professional ignorance or neglect of the defendant in treating her broken hip and which elicited answers tending to such proof, was improper and the defendant's exceptions thereto should have been sustained. The subsequent testimony as to the serious character of her tuberculous trouble and the important bearing which such a state of health has upon the proper treatment to be adopted with persons in her condition when suffering from fractured bones, emphasizes the importance of requiring hypothetical questions put to medical experts to be so framed as not to give a wrong coloring or undue importance to some of the facts in evidence by the omission or suppression of others.

The nineteenth bill of exception raises the question of the. propriety of permitting Mrs. William Burke to testify that Dr. Miller told her over the telephone at one o'clock of the day of Mrs. Leib's accident that he would come out to see her. Mrs. Burke had testified that she did recognize the voice speaking over the 'phone to her as that of Dr. Miller as she did not then know him. At the end of the plaintiff's evidence the defendant moved to strike out this testimony of Mrs. Burke, but his motion was overruled and he excepted to the ruling.

In *The Knickerbocker Ice Co.* v. *The Gardiner Dairy Co.,* 107 Md. 556, decided at the January Term of this Court, we reviewed at some length the law and the authorities touching the admissibility in evidence of messages received over the telephone from parties whose voice was not recognized by the witness. In holding to be admisible in that case certain tele-

phone messages from the Ice Company's office, touching the
price of ice and the terms on which it would be sold, we cited
with approval the statement from the opinion in *Wolff* v. *Mo.
Pac. R. R. Co.,* 97 Mo. 473 : "When a person places himself in
connection with the telephone system through an instrument
in his office, he thereby invites communication in relation to
his business through that channel.   Conversations so held
are as admissible in evidence as personal interviews with an
unknown clerk in charge of an ordinary shop would be in
relation to the business therein carried on."   As the commu-
nication put in evidence in the present case came over the
telephone, in response to a request similarly sent to Dr. Mil-
ler's office, and purported to be from him, and was not strict-
ly personal or medical in its nature but consisted merely of
an alleged statement on the doctor's part that he was unable
to respond at once, to a request to visit a patient, accompanied
by a promise to do so after he had closed his office, we think
it was properly permitted to go to the jury to be considered
by them in connection with his testimony that he got there
as soon as he could after receiving a telephone request to
come, which according to his account reached him about six
or seven o'clock in the evening.

The other bills of exception to evidence rest upon the
ground that certain testimony on behalf of the plaintiff was
improperly admitted in rebuttal because it should have been
offered, if at all, in chief.   We have repeatedly decided that
the mere order of proof and the circumstances under which
evidence should be admitted or rejected when offered out of
proper order is, in the absence of any rule of Court upon the
subject, in the discretion of the trial judge as the tribunal
best qualified to determine what the justice of the case may
require and that his rulings on such subjects will not be re-
viewed by us.   *Ridgely* v. *State,* 75 Md. 515-516; *C. & P.
R. R. Co.* v. *Slack,* 45 Md. 176;   *Bannon* v. *Warfield,* 42
Md. 39.

At the close of the case the plaintiff offered five prayers of
which the Court granted the first three and refused the

fourth and fifth.   The defendant offered ten prayers of which the Court granted the first and seventh as offered and the fourth and sixth as modified and rejected the others.

We have several times passed upon the degree of care and skill required of attending physicians or surgeons toward their patients.   In *State, use of Janney,* v. *Housekeeper,* 70 Md. 171, we used the following language: "It was the duty of the professional man to exercise ordinary care and skill, and this being a duty imposed by law, it will be presumed that the operation was carefully and skilfully performed; in the absence of proof to the contrary.   As all persons are presumed to have duly performed any duty imposed on them, negligence cannot be presumed but must be affirmatively proved.   *Best on Presumptions,* page 68; *Railroad* v. *Chappell,* 21 Fla. 175.   This principle is especially applicable in suits against physicians and surgeons for injuries sustained by reason of alleged unskilful and careless treatment.   The burden of proof is on the plaintiff to show a want of proper knowledge and skill."

In *Dashiell* v. *Griffith,* 84 Md. 380, we again said upon the same subject: "The law is settled in numerous well-considered cases, that a physician or surgeon who holds himself out to the world to practice his profession, by so doing impliedly contracts with those who employ him that he possesses a reasonable degree of care, skill and learning, and he is therefore bound to exercise and is liable for the want of, reasonable care, skill and diligence, and he is responsible in damages arising as well from want of skill as from neglect in the application of skill.   *   *   *   The cases are generally agreed upon the proposition, that the amount of care, skill and diligence required is not the highest or greatest, but only such as is ordinarily exercised by others in the profession generally."

The law as announced in the foregoing cases is substantially embodied in the defendant's first, third and fourth prayers as granted by the Court in the present case, and there was therefore no error in granting those prayers.

The plaintiff's first prayer in effect instructs the jury that if they found that the plaintiff sustained the fracture of her femur and that the defendant was a physician and surgeon, and as such undertook to treat her and did not exercise reasonable care and skill in ascertaining from what she was suffering or in his treatment of her case, and that by reason of such failure on his part she suffered pain and lost the use of her limb, she was entitled to a verdict in her favor. This prayer made no reference to the evidence in the case tending to show a tuberculous condition of the plaintiff at and after the time of the accident and the effect of such a condition upon the propriety of the treatment of the plaintiff's case adopted by the defendant, but the Court granted the prayer in connection with the plaintiff's third prayer, by which, as modified by the Court, the jury were directed not to allow any damages on account of the treatment given to her by the defendant for tuberculosis, nor for such delay in his treatment of her hip as resulted from his diagnosis of tuberculosis in her. We find no reversible error in the granting of the two prayers in connection, thus limiting the first by the proviso contained in the third.

The plaintiff's second prayer, which was granted generally, was an amplification of the first prayer, but was predicated especially upon the finding by the jury of the commission by the defendant of certain specified mistakes in the diagnosis of the plaintiff's condition and want of care and skill in specified respects in the treatment of her case. This prayer also was entirely silent as to the important evidence touching a tuberculous condition of the plaintiff, and had therefore the practical effect of withdrawing from the consideration of the jury the evidence reflecting upon facts not mentioned in the prayer, which if believed by them would have defeated the plaintiff's right of recovery. A plaintiff's prayers need not negative every theory of defense finding support in the evidence, but prayers asserting a plaintiff's right to recover upon the finding by the jury of certain facts, which if standing alone would justify a verdict in his

favor, but ignoring the evidence tending to establish other and inconsistent facts, have been repeatedly held by this Court to be misleading and erroneous. *Corbett* v. *Woolford,* 84 Md. 428; *Bank of Bristol* v. *B. & O. R. R.,* 99 Md. 682; *Haines* v., *Epply & Pearce,* 41 Md. 234; *Kennedy* v. *Co. Commrs.,* 69 Md. 71; *Adams* v. *Capron,* 21 Md. 205; *B. & O. R. R.* v. *Shipley,* 31 Md. 370-71.

There was no error in rejecting the defendant's second and fifth prayers, which merely consist of the statement from a different standpoint of propositions of law covered by the granted prayers. Nor was there any error in rejecting the defendant's eighth, ninth and tenth prayers, which sought to take the case from the jury for want of legally sufficient evidence to entitle the plaintiff to recover. We cannot say that there is no evidence in the record tending to support the plaintiff's case which if believed by the jury would be legally sufficient to be entitled to their consideration in arriving at a verdict.

For the error of the Court below in overruling the defendant's objections to the hypothetical questions put to Dr. Duvall and his answers thereto, which we regard as material and tending to prejudice the defendant's case, and the error in granting the plaintiff's second prayer, the judgment appealed from must be reversed and the case remanded for a new trial.

*Judgment reversed with costs and cause remanded for new trial.*