JOHN H. WILLIAMS *vs.* THE STATE OF MARYLAND.

*Homicide—Malice—Evidence—Physical Condition of Deceased—Post mortem Examination—Medical testimony—Hypothetical question—Expert testimony.*

In a trial for murder, the State may prove, as bearing upon the question of malice, that on the day before the fatal assault, and several days prior thereto, the prisoner had beaten and otherwise maltreated the deceased; and may follow up this evidence, and show, that prior to the assault the deceased was in ordinary health, and that afterward he complained of pains in his head and breast, and that he continued to complain up to the day of the homicide; such evidence as to the physical condition of the deceased at the time the injuries were inflicted, aiding in the determination of the question of his having died from the effects of such injuries.

The mere fact that a *post mortem* examination is made some time after death, is not in itself a reason why the result of such examination should be excluded, unless the interval is so great and the condition of the body is such, that the jury could not reasonably find whether its condition was to be attributed to *ante mortem* or *post mortem* causes.

A physician may express an opinion as to what would be the result of pressing violently with the foot upon the neck of a man lying on the ground.

In framing a hypothetical question it is not necessary to refer to all the evidence in the case relating to the subject of the inquiry.

An expert may give an opinion not only as to the nature and effect of an injury, but also as to the manner in which, and the instrument by which it was inflicted.

While an expert may give his opinion upon facts assumed to have been established, he will not be allowed to state his opinion upon the conclusions and inferences of other witnesses.

APPEAL from the Circuit Court for Somerset County.

The case is stated in the opinion of the Court.

*First Exception.*—Frederick Boye, a witness on the part of the State, testified that on the 21st of November, 1884, on board the oyster boat, Eva, the accused kicked Meyher several times ; Meyher then cried out ; the captain laughed and went away ; the captain pushed him down twice on that occasion and also hit him ; took hold of him by the breast, and struck him several times on the breast. The witness was then asked by the State's Attorney what was the physical condition of the deceased (Otto Meyher) up to that time ? He answered that "up to that time Meyher had never complained, but worked and ate as we did ;" which question and answer were not objected to at the time. The State's Attorney then asked the further question, " what was the physical condition of Otto Meyher on the following day," but before it was answered by the witness he withdrew the question. Counsel for defence then asked the Court to rule out all the testimony as to the striking and beating on the 21st of November, and also that in relation to the physical condition of Otto Meyher up to that day ; but the Court was of opinion that all of said evidence was admissible and refused to rule it out. Thereupon the counsel for the defence asked the Court to rule out all evidence relating to the physical condition of Otto Meyher prior and up to that day, viz., 21st of November, 1884, but the Court refused to rule out the said evidence. To which said several rulings of the Court the defendant excepted.

*Second Exception.*—After the evidence set forth in the first bill of exception had gone to the jury, the State's Attorney asked the said witness, Frederick Boye, the following question, " what was Otto Meyher's physical condition from and after the 21st of November ?" To the asking of this question the prisoner objected, but the Court overruled the objection and permitted the question to be asked. To this ruling of the Court the prisoner excepted.

*Third Exception.*—The State having offered the evidence set out in the defendant's first and second bills of exception, further proved by the witness, Frederick Boye, that on the 22nd of November, after the said assault by Williams, the said Meyher complained of pains in his breast and head, and so complained until the 26th of November. The State's Attorney then asked the witness the following question: "What occurred, if anything, on the 25th of November?" To this question the defendant, by his counsel, objected, but the Court overruled the objection and permitted the State's Attorney to ask the question. To this ruling of the Court the defendant excepted.

*Fourth Exception.*—The State, after giving evidence of brutal treatment of Meyher by the prisoner, introduced the witness, J. Edwin Slemmons, who testified that he went to search for Williams on Christmas day, stopped at McLane's in his search; he then searched Williams' house, and on information received went to the woods; then gave up the search and returned to Westover and Princess Anne; saw nothing however of Williams, though he pursued with haste and vigor; he afterwards, on the 27th of December, overtook Williams on the road to Princess Anne with Ben Green; Williams told him that he would not have run on that occasion (Christmas,) but he thought he wanted him to appear at the United States' Court, and that he was then on his way to Princess Anne to give himself up; that the witness had then been to attend an inquest on that day, the 27th of December, on the body of Otto Meyher. The State's Attorney then asked the witness whether or not he had that day viewed the body of Otto Meyher, and announced that his purpose was to show what the condition of the said body was on that day; whereupon the defence objected to the question, on the ground that it was inadmissible and illegal, but the Court overruled the objection and permitted the question for the purpose aforesaid to be asked. To this ruling the defendant excepted.

Williams *vs.* State.

*Fifth Exception.*—The State's Attorney further examined the said J. Edwin Slemmons, who testified that he was present at an inquest on the 27th of December, 1884, on the body of Otto Meyher; that they went to the grave of said Meyher, opened it, and witness ripped open the coffin lid, and Capt. Muir lifted the man out of the coffin; the State's Attorney then asked this question, "was there any examination made of the body on that occasion in your presence?" offering to follow it up by other evidence that "the witness heard the crack of the bones of the neck; that an incision was then made in the neck by a competent physician, and the neck was pronounced by him to be broken; and that witness saw the dislocated bones; that shortly after Meyher's death and prior to the examination at which witness was present, a partial and superficial examination had been made by another jury and a physician, at which the crackling of the neck bones was heard; but no incision was made by the physician, and that a physician at the last examination had heard the crack of the bones which witness had heard," and declared in the presence and hearing of the witness, and of the coroner's jury then sitting, that the neck was broken before he made the incision, and that he knew this by the *crepitation* of the bones. The State also offered to follow up said testimony by medical evidence to the effect that such *crepitation* is a certain indication that the neck is dislocated; to the asking of which question, to be followed up as stated, the defendant objected, but the Court overruled the objection and permitted the question to be asked, if followed up as stated. To this ruling the defendant excepted.

*Sixth Exception.*—The State then introduced Dr. Rufus Dashiell, who testified that he had practiced medicine since 1872; that there were two external evidences of a broken neck, unusual motion and crepitation; crepitation establishes dislocation of some bones, and most likely between the axis and the atlas; they are the only two that

can be well dislocated. The State then asked the witness the following question: "Suppose a man should be lying upon the ground, prostrate, and another should place his foot upon his neck, and squeeze or bear down violently upon it, would any result likely follow, and what would be that result to the neck?" To the asking of this question the defendant objected, as illegal and inadmissible; but the Court overruled the objection and permitted the question to be asked. To this ruling the defendant excepted.

*Seventh Exception.*—The State then asked the witness, Dr. Rufus Dashiell, the question above stated, and he answered, that there would be discoloration of the skin, and there might probably be a dislocation of the bones of the axis and atlas of the neck. The State's Attorney then asked the following question: "If a man had been beaten in the back violently with a handspike, in the hands of another man, and the man receiving the blows was knocked down at each blow, and if these blows were repeated several times, and if the man who had been beaten should afterward manifest great tremulousness of body and of limb, to what would you attribute that tremulousness? To this question the defendant objected, but the Court overruled the objection and permitted the question to be asked. To this ruling the defendant excepted.

*Eighth and Ninth Exceptions* stated in the opinion of the Court.

The jury rendered a verdict of "not guilty of murder in the first degree, but guilty of murder in the second degree." The prisoner appealed.

The cause was submitted to ALVEY, C. J., YELLOTT, STONE, MILLER, ROBINSON, RITCHIE, and BRYAN, J.

*Henry Page, Thos. S. Hodson,* and *John W. Crisfield,* for the appellant.

*Charles B. Roberts, Attorney-General,* for the appellee.

ROBINSON, J., delivered the opinion of the Court.

The prisoner, the captain of an oyster boat, was tried for the murder of Otto Meyher, one of the hands under his employment.

The question presented by the first exception is, whether it was competent for the State to prove, that on the day before the fatal assault, and several days prior thereto, the prisoner had beaten, and otherwise maltreated the deceased? The charge of murder against the prisoner necessarily involved the question of malice, for there must be *malice express or implied,* to constitute murder. As bearing then upon this question, the evidence was clearly admissible. In the absence of evidence tending to show justification, excuse or extenuation, malice it is true may be presumed from the proof of the homicide itself, but the State is not bound to rely upon this presumption, and may offer other and independent evidence tending to prove malice—and this too, without regard to the evidence offered or defence set up by the accused.

Having proved the prisoner had assaulted and beaten the deceased in the most cruel and inhuman manner just before the day of the fatal assault charged in the indictment, the State had the right to follow up this evidence and show, that prior to these assaults Meyher was in ordinary health, and that afterwards he complained of pains in his head and breast, and that he continued to complain up to the day of the homicide. To sustain the indictment the State was bound to prove that Meyher died from blows and injuries inflicted by the prisoner; and in the determination of this question, the physical condition of Meyher at the time these injuries were inflicted, was a material inquiry. An injury that may prove fatal to one already enfeebled and suffering from great bodily harm, may not prove so to one in robust and vigorous health. The ruling

of the Court in the fourth exception is one, we think, equally free of difficulty.

The proof shows, that on the morning of the 25th of November, 1884, the deceased being unwell, the prisoner gave him some medicine—that he attempted to work, but being unable to work, or because his work was not satisfactory, the prisoner beat him five or six different times across the back and sides with a shovel or handspike; that evening the deceased complained of pains in his back and breast, and cried out "my God," "my God," and said he was sore all over. The next morning the deceased again tried to work, but being unable to wind up the anchor, one of the hands jerked it, and Meyher fell upon the deck. While lying there the prisoner came up and kicked him several times, and every time Meyher shrieked, the prisoner pressed his foot heavily on his throat. After these brutal assaults the prisoner tied a rope around the body of Meyher, and fastening the rope to a hook in the front sail, dragged him from one end of the boat to the other. The deceased again promised to work, but he was very weak, and in the attempt to turn the crank of the dredge he fell lengthwise across the deck, and while lying there, the prisoner again kicked him five or six times, and again pressed his foot on his neck. The prisoner then tied the thumbs of the deceased with a rope, and by the means of a hook fastened to the rope, the body of the deceased was hoisted until his feet were above the deck. After this, the deceased was put into a yawl boat and landed on the shore, where a few hours afterwards he died. The next day a jury of inquest was summoned, and Doctor Gill made an external examination of the neck of the deceased. In moving the head and neck backwards and forwards he at first thought he heard a *crepitation,* indicating the neck was broken, but not hearing the sound again he concluded he must have been mistaken, and was of opinion that the neck was not broken. Thus ended this imperfect and un-

satisfactory examination, and the body was buried. On the 27th of December, one month afterwards, the prisoner was arrested and a second jury of inquest was summoned, and for the first time a thorough *post-mortem* examination of the body was made by Doctor Miles. The result of this examination, showing that the neck was broken, and that large dark-colored patches or bruises were found on various parts of the body, was offered in evidence. But objection was made to its admissibility, on the ground that the condition of the body one month after the deceased was buried, was *not legitimate evidence* from which the jury could reasonably infer its condition at the time he died.

A thorough examination made immediately after death, would of course have been more satisfactory and conclusive than one made some time afterwards. But the weight of the evidence was a matter for the jury, to be determined by them in connection with all the facts and circumstances in the case. The·mere fact, that the examination is made some time after death, is not in itself a reason why the result of such examination should be excluded, unless the interval is so great and the condition of the body is such, that the jury could not reasonably find whether its condition was to be attributed to *ante-mortem* or *post-mortem causes*. And such was not the case here. The weather was cold and decomposition had just set in. No difficulty was experienced by the physician in making the examination. He first began by making an external examination, moving the head and neck, and heard distinctly a crepitation of the bones of the neck, showing the neck was broken. He then made an incision in the neck and found there was a dislocation between the bones known as the *atlas* and *axis*—an injury which was, in his opinion, fatal. Large dark patches were also found on different parts of the body. If this evidence was not conclusive as to the condition of the body at the time it was buried, it was certainly

legitimate evidence to be considered by the jury in determining that question.

In the sixth exception objection is made to the following question : "Suppose a man should be lying on the ground, prostrate, and another should place his foot upon his neck and squeeze or bear down violently upon it, would any result likely follow, and what would be that result to the neck ?"

The proof shows, the prisoner not only pressed his foot on the neck of the deceased while he was lying on the deck of the boat, but also afterwards while he was lying on the shore and just before he died,—and further, that when the examination was made by Dr. Miles, he found the neck was broken.    Was this dislocation of the neck caused by the pressure of the prisoner's foot on the neck of the deceased, was the question to be determined ?  And this depended upon the strength of its parts, and their power to resist violence, involving necessarily the anatomy of the neck, and strictly within the rule in regard to expert testimony.    We see no objection to the form of the interrogatory.    If a wound is proven, an expert, it is conceded, may state the means by which it was inflicted.  If so, the converse of the proposition is equally true.    What would be the probable effect of a man's pressing his foot with great force or violence on the neck of one lying on the ground, depended of course upon the pressure used and the strength of the neck to resist it, matters in regard to which an expert ought to be better able to form a judgment than ordinary witnesses.

As to the seventh exception, the proof shows not only that the prisoner beat the deceased with a hand-spike or shovel, no less than five or six times, but that afterwards he had what the witness termed *"a snatching chill."*  This evidence was sufficient certainly to serve as a basis for the hypothetical question put to the witness.

It was wholly unnecessary in framing the question to refer to all the evidence bearing upon Meyher's condition

before and at the time he had "the snatching chill." The defence had the right on cross-examination to inquire how far and to what extent the opinion of the witness would be modified by the consideration of other facts omitted from the hypothetical question.

In the eighth exception, Dr. Dale, witness for the prisoner, testified, he made an examination of the body on the 29th of December, two days after the examination of Dr. Miles, that he found an incision between the base of the occiput and the atlas which had severed all the posterior and part of the lateral ligaments and muscles that unite the atlas and the occiput; that he found no other injury about the neck; that in his opinion the neck was not dislocated, and further, that such injury could not have been produced by the pressure of the foot of a man on the neck.

The attorney for the State, then asked the following question: "Could all the posterior and a portion of the lateral muscles and ligaments, connecting the atlas with the occiput, be severed, as you saw them, by accident, or must such severance, if it existed, have necessarily been produced by design?" It is well settled that an *expert* may give an opinion not only as to the nature and effect of an injury, but also the manner or instrument by which it was inflicted. And such we understand to have been the purpose of this inquiry, although the answer of the witness is not set forth in the record. We see no objection to the question, although we must confess in view of all the evidence, its bearing upon the issue before the jury, seems to us quite remote and shadowy.

In the ninth and last exception, the counsel for the prisoner proposed to ask Dr. Robertson, the following question: "The neck of the deceased, upon being examined by a physician, is together with the head, worked for ten or fifteen minutes in all directions, by a person acting under the orders of the physician, for the purpose of producing crepitation, the physician hears a single sound which he

afterwards testified was crepitation, but the person having the head and neck in his hands, and others who were in a position to hear any such sound, failed to hear the same, and after so working the head and neck for that length of time, the physician said, 'I was mistaken, the neck is not broken, and no further crepitation was heard or produced in the neck during the said examination, what would be your opinion as a physician as to the fracture or dislocation of the neck?"

Now while an expert may give his opinion upon facts assumed to have been established, it would be against every rule and principle of evidence, to allow him to state his opinion upon the conclusions and inferences of other witnesses.

Here, the witness was not asked his opinion in regard to the dislocation of the neck of the deceased, *based upon the failure of Dr. Gill, who conducted the examination, to reproduce crepitation,* but based also upon the conclusions reached by Dr. Gill in regard to the subject-matter of inquiry.   For this reason the question was clearly objectionable.   Finding no error in the several exceptions relied on, the rulings will be affirmed.

*Rulings affirmed, and*
*cause remanded.*