## THE UNITED RAILWAYS AND ELECTIC CO. OF BAL-MORE CITY *vs.* EDWARD SEYMOUR.

*Negligence—Rear End Collision on Street Railway—Contributory Neg-ligence—Evidence—Question to Medical Expert.*

Plaintiff was driving a loaded wagon on the track of a suburban electric railway at the foot of a hill, when defendant's car coming in the same direction ran into the wagon causing the injury for which this suit was brought.   The accident happened early in the evening, but it was then completely dark, and the neighboring lights did not enable the motor-man to see an object on the track until he was within a few feet of it. A man on the wagon with the plaintiff, looking in the direction of the approaching car, directed plaintiff to turn out as soon as he saw it, and plaintiff began to do so, but too late to avoid the collision.   The pub-lic was accustomed to drive in the tracks at that place, and the car came down the hill running at full speed while the darkness prevented the motorman from seeing whether the track was clear or not.   *Held,*

1st. That there was legally sufficient evidence of defendant's negligence to take the case to the jury.

2nd. That there was no evidence of such contributory negligence on the part of the plaintiff as to preclude a recovery.

In an action to recover damages for an injury caused by defendant's car colliding with plaintiff's vehicle from the rear, a witness, who had testified to the rate of speed of the car, was asked on cross-examination: Can you watch a car coming towards you at night and tell how fast it is coming, or are you different from other people ? *Held,* that it was not error to refuse to allow this question to be put, since the second part of it is irrelevant.

In an action to recover damages for a personal injury, a medical witness, who had examined the plaintiff and testified as to his physical condition. may be asked if a particular abnormal condition of the plaintiff could have been caused by the injury in question.

Appeal from the Superior Court of Baltimore City (HARLAN, C. J.) In the sixth exception the motorman of the car, which caused the injury complained of, testified that the space within which a car can be stopped "depends altogether on the conditions of everything, the condition of the rail, the position the car is in and everything else. There is no certainty about a thing of that kind, no matter what the speed." The counsel for the plaintiff then asked the following question: "Speaking of the conditions that night right on those rails, supposing now the car were running at a speed of six miles an hour on the same track before the accident happened, just immediately before the accident happened, at what distance could you, as motorman, with the appliances you had on that car for checking it, could you have stopped that car?" To this question the defendant objected, but the Court overruled the objection and permitted the question to be asked. And the witness answering said: "Well you say about stopping, running at the rate of six miles an hour. Just as I told you in the first place when you asked me how many miles an hour was I running at the time of the accident; I have no idea what six miles an hour is; I know when we are running full speed, half speed and such as that, but as to the distance in miles or the time I am not supposed to know that."

The plaintiff obtained a judgment on verdict for $800.

The cause was argued before McSHERRY, C. J., FOWLER, PAGE, BOYD, PEARCE SCHMUCKER and JONES, JJ.

*William S. Bryan, Jr.,* (with whom was *E. H. Harris* on the brief ) , for the appellant.

*R. R. Boarman* for the appellee.

PAGE, J., delivered the opinion of the Court.

The two main questions that arise in this case, are, 1st: Is there any evidence to go to the jury of negligence on the part of the appellant, and, 2nd, did the Court err in refusing to instruct the jury that the appellant was guilty of contributory negligence.

Taking up the first of these it is necessary to present a statement of the principal facts of the case.   On the seventh day of September, between seven and eight o'clock, it being then dark, the appellee was driving a wagon loaded with 1013 feet of lumber on the north-bound railway tracks of the appellants along and over Roland avenue in Baltimore County. While so travelling a car of the appellants, moving in the same direction, came upon him from the rear ; whereby his wagon was broken, his horse thrown down the embankment and injured, and he himself was hurt.   At the point where the accident happened the appellant's tracks, of which there are two sets, the one for south-bound and the other for north-bound cars, are in the bed of Roland avenue.   The rails are not exactly in the centre of the road, but a space, the length of a "walking stick," separated the north and south-bound tracks. On the right hand, looking north, was a narrow and possibly (the testimony is not clear), a sandy and heavy dirt road. Whether the public have a right to use the tracks at that point or not for the purpose of driving over and along them, the evidence is not clear.   Both sides, however, seem to concede that it had ; and the case was argued upon that hypothesis. Whether it had or not, however, is not very material, for it is clear that it was not the habit of the public to so use them, presumably without objection from the railway company, since it had laid at that point the flat rail which makes a convenient and comfortable roadway for the passage of wheeled vehicles.   The

appellee testified that people did not "attempt to drive out on the *dirt road* unless the car track was in use," and that they used the dirt road in preference, "only when the vehicle did not fit the tracks." The point, therefore, where the accident occurred, was one where, with the knowledge of the railway company, the public was in the habit of driving along the rails ; and, if such was the fact, it was the duty of the company to handle its cars with such reasonable care as such a situation demanded. The night was not only dark, but the particular situation intensified the darkness. The accident happened at the foot of a hill, "in a hollow," and to the north and south were heavy grades. That down which the wagon and car came was very considerable ; it was estimated by a witness to be about twenty-five in the hundred feet. The distance from the top of the hill down this grade, the motorman testified, was "pretty close to three-quarters of a square." In this hollow and up the grade there were trees on both sides of the road making it, as one witness said, "terribly dark." Added to this there were also clusters of lights at Heath Brook, which the motorman testifies cast their light diagonally across and not down the track and so added to the gloom, and further prevented him from seeing through them along and down the track. For these reasons it was impossible for the servants of the company to see the wagon until the car was but a few feet distant from it. The situation, therefore, that was presented to the motorman, when he reached the top of the hill, was that of a steep grade, so obscured in darkness as to prevent his vision from reaching even with the aid of his headlight, more than a few feet, a flat rail along which he knew or ought to have known the public had been and still was in the habit of passing with wagons and other vehicles. What was his plain duty under such circumstances ? Obviously to use such reasonable precautions as were necessary for the protection of any one who might be upon the tracks. There was evidence to show that instead of reducing the speed, so that the car could be stopped within the distance in which a wagon could be seen by the motorman, it was allowed to come down

the grade at full speed.   About the rate of speed the evidence is conflicting, but there is much testimony going to show that the speed was very fast; and the motorman himself said he was "running at a rate of nine points until he saw the wagon," and that "nine points is the full running speed of the car."   "Negligence is essentially relative and comparative and not absolute.   It is intrinsically true that those things which would not under one condition constitute negligence, would, on the other hand, under a different, though not necessarily an opposite condition, most unequivocally indicate its existence."   *Cooke* v. *Balto. Trac. Co.*, 80 Md. 555.

Here, when the car reached the top of the hill the motorman had no right to anticipate that no vehicle would be on the track, and he was unable to ascertain by the use of his eyes and ears, or by any other means at his command, whether or not the tracks were clear.   If, therefore, the jury found that under such circumstances he ran his car at full speed on the down grade, through the impenetrable darkness, over the road which he knew the public were accustomed to use in wagons or other vehicles at an early hour in the evening, without taking special and reasonable precautions to protect those who might happen to be there, they would be at liberty to find the company acted negligently.   We think, therefore, there was evidence upon this question to go to the jury.

The next question, is, did the evidence make such a clear case of contributory negligence on the part of the appellee as to enable the Court to take the case from the jury.   Unless the uncontradicted evidence in the case proves such a glaring act of carelessness on the part of the appellee as to amount in law to contributory negligence, it is the duty of the Court to submit the matter to the jury.   *McMahon* v. *N. C. R. Co.*, 39 Md. 449.

Here, there was evidence tending to show that the appellee was driving at a " moderate " rate of speed on the tracks at a point where the public was accustomed to drive, with the consent of the appellant.

Riding on the same wagon was William Green, who was

sitting on the rear part of the wagon, with his face turned to the direction from whence the car came. He saw the car and told the appellee, who " then commenced " turning out. If the jury believed these facts, relating to the conduct of the appellee, it would be difficult to point out wherein he had acted negligently. He was driving at a place where the public were accustomed to drive, and he might well suppose that the railway company would be reasonably careful not to allow their cars to collide with his wagon. If there was testimony contradicting these facts, it would be for the jury to find where the truth was, and if they found other facts, which in their judgment should be taken into account in determining the question of the appellee's negligence, they also should be submitted to them. Negligence is usually a question for the jury to decide upon all the facts of the case; *Shipley's case*, 31 Md. 368; *B. & O. R. R.* v. *Miller*, 29 Md. 252, and when " it can only be correctly determined by considering all the attending and surrounding circumstances of the transaction, it falls within the province of the jury to pass upon and characterize it." *Cooke* v. *Baltimore Traction Co.*, *supra*.

We do not deem it necessary to refer particularly to the instructions granted by the Court. In view of what has been said, it follows, that the case was properly submitted to the jury. The appellant was not injured by the rejection of its second prayer, because the granting of its sixth prayer gave it substantially all that was asked by the rejected prayer. By the sixth prayer the jury were told that any want of ordinary care and prudence on the part of the appellee that contributed to the accident would deprive him of his right of recovery; and that is substantially the same proposition contained in the rejected prayer.

There remains to consider the several exceptions to the evidence. The witness Hayes had testified, in chief, that he "judged the car was going fifteen or eighteen miles an hour." On cross-examination the appellants counsel asked him how he measured the speed, and the witness replied that he had been on the cars and was a pretty good judge. He was then

asked, " Can you watch a car coming towards you at night, and tell how fast it is coming, or are you different from other people ? " To the refusal of the Court to permit this question to be asked, the appellant excepted.    The question has two parts, first, if the witness could tell how fast the car was coming ; and if it contained no more than this, it would not be open to objection.    The residue of this question was improper. It had no relevancy to any issue involved in the case.    The whole question was therefore improper and the Court properly refused to permit it to be put.

The fourth and fifth exceptions present cases where on cross-examination the witness, Dr. Preston, a medical expert produced by the appellant, was asked for his opinion upon the hypothetical cases based upon facts assumed to be established by other testimony.    On his examination-in-chief he had testified as to the physical condition of the appellee ; on cross-examination he was asked by the appellee's counsel (in the fourth exception), "if this man hadn't any pain in his leg at all before the accident, and then following that it pained all the time after it was injured, the swelling of the leg on rainy days and wet seasons, worse sometimes than it would be on dry days, and that continued on down for several months, what would you attribute that pain and swelling to ?" And in the fifth, "if it is a fact that Seymour had no pain in the knee before the collision on seventh of September, 1899, no swelling in the knee or leg before that, but after the accident happened he had continued pain in the knee or swelling of the leg from time to time up to the present time, what would you attribute the cause of that swelling and pain in the leg to ?" There are no objections to these questions.    It was not necessary in forming the question to refer to all the testimony bearing on the appellee's condition, and the witness as an expert could state his opinion upon facts shown by the evidence.    *Williams* v. *State*, 64 Md. 384.    The witness Preston also stated in his examination-in-chief, among other matters, that he had found some enlargement of the heart, which could be ascribed to chronic rheumatism and that all his other organs " seemed

sound;" that he could see no evidence of injury to his nervous system. He also said on cross-examination that his left leg was a quarter of an inch shorter than the right, and the thigh a quarter of an inch less in circumference than the other. He was then asked by the appellee's counsel. "Could that have come from the injury." The appellant's counsel objected, but the Court overruled it and this constitutes the third exception. There was clearly no error here. Dr. Preston, as an expert, was qualified to give his opinion as to the condition of the appellee, and having found something about him that was abnormal could state whether in his opinion that could have been the result of the injury. It was competent for the expert to state the nature and effect of the injury, and upon cross-examination the appellee had a right to put an hypothetical case, founded upon the testimony, and inquire of the expert his opinion upon the fact so stated. *Williams* v. *State*, 64 Md. 394; 12 *Am. & Eng. Enc. of Law*, page 447.

We find no error in the sixth exception; the question there stated is unobjectionable.

Finding no error in the record we must affirm the judgment.

*Judgment affirmed.*

(Decided January 17, 1901.)