MATILDA DETTERING *vs.* MICHAEL S. LEVY ET AL.

*Injury to Operative in Factory from Revolving Shaft—Duty*
*of Employer to Cover Dangerous Machinery When*
*Practicable—Evidence—Assumption of*
*Risk—Contributory Negligence.*

In an action to recover damages for an injury caused to an employee in a factory by uncovered and rapidly revolving shafting, evidence is admissible to show that it was practicable to cover the shafting, and as to what the general custom as to such covering is.

In such action, evidence is admissible to show whether the force and effect of a rapidly revolving shaft are generally known to untrained persons, in connection with the questions of assumed risk and contributory negligence.

When women employees in doing their work are brought in proximity to a rapidly revolving shaft so that their clothing or hair may be caught by it if they happen to approach a few inches closer than their work ordinarily requires, it is the duty of the employer to cover or protect the shafting if such covering is practicable.

The rule that an employee assumes the risk of danger in his employment should be limited to risks which are obvious and which can be understood by an employee of ordinary intelligence, or at most to those which should be anticipated

by the employee as the result of conditions which are obvious,
or can reasonably be expected to be known by him.

Plaintiff was one of thirty-four women operating sewing ma-
chines at a long table in a straw-hat factory. Underneath
the centre of the table, about eight inches from the floor and
about twenty-three inches from the edge of the table, there
was a rapidly revolving shaft which was uncovered between
the pulleys on it, the distance between the pulleys being forty
inches. Plaintiff got down on her hands and knees to look
under the treadle for a tool, when her hair was caught on
the shaft and her scalp was torn off. At different times be-
fore that, the skirts of the operators sitting at the table and
using the treadles, had occasionally been caught in the shaft
and torn off. There was no evidence to show that it would
have been impracticable to cover the shafting between the
pulleys. *Held,* that under these circumstances, the failure to
protect the shafting is sufficient evidence of negligence on the
part of the employer to be submitted to the jury.

*Held,* further, that since the plaintiff testified that she knew
that it was dangerous to touch the shafting, but did not
know that it would draw her hair when it was ten inches dis-
tant therefrom, the plaintiff did not assume the risk of the
danger which caused the injury.

*Held,* further, that although the plaintiff could have borrowed
the tool she was looking for at the time of the accident from
another operative, or could have run a stick under the
treadle to find it, she was not guilty of contributory negli-
gence because she did not adopt one of these plans, but got
down and looked under the table.

*Decided January 10th, 1911.*

Appeal from the Baltimore City Court (ELLIOTT, J.).

The cause was argued before BOYD, C. J., BRISCOE,
PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and
URNER, JJ.

*Joseph N. Ulman* and *Clarence A. Tucker* (with whom were *S. J. Harman* and *Chas. H. Knapp* on the brief), for the appellant.

*Vernon Cook* and *Charles Markell* (with whom were *Gans & Haman* on the brief), for the appellees.

Boyd, C. J., delivered the opinion of the Court.

The appellees conduct a factory in the City of Baltimore for the purpose of manufacturing straw hats, and the appellant was employed by them, and had been for fourteen years prior to the accident complained of, as a sewing machine operator. In the room in which she worked there were eight rows of tables which were fifty feet long, forty-six inches wide, and two feet, six inches high. There are on each table thirty-four sewing machines which are located on the two sides of the table, forty inches apart, and almost directly opposite each other. They are driven by power supplied by shafting from below, which is one and three-sixteenth inches in diameter and revolves at the rate of four hundred and fifty revolutions per minute. It runs the length of the table, directly in the centre, eight inches from the floor. There are on the shaft pulleys or collections of wheels consisting of a disc wheel twelve inches in diameter, clamped permanently to the shaft and revolving with it, a leather friction wheel five inches in diameter, which runs against the disc wheel when the sewing machine is in operation, and back of the leather friction wheel there is a grooved wheel seven inches in diameter which has six spokes and carries a one-quarter inch leather belt, which connects with the sewing machine on the table. There is a treadle which the operator presses on to start her machine, thereby bringing the leather friction wheel in contact with the disc wheel. When the machine is not in use the leather belt is not in motion but the pulley or disc wheel on the main shaft is always in motion when the shaft is.

The treadle is 12 or 14 inches long.  Each operator has at her place a needle wrench, which is used for changing the machine needle when the character of the work to be done is changed, and also a screw driver, an oil can and a measure, which are kept in the machine drawer each one has.  On November 12th, 1908, the appellant wanted to change to coarse work and had to change her needle.   She could not find her needle wrench and got down on the floor to look for it, and not finding it, got up again and looked in her machine drawer.  She then got down again—was on her hands and knees and was looking under the treadle.  The front edge of the treadle is directly under the front edge of the table.  As she looked for the needle wrench her hair caught on the shaft and her entire scalp was torn off.

The testimony tends to show that her hair caught on the smooth shafting about eighteen inches from the pulleys connecting it with her machine and twenty-two inches from the pulleys connecting the shaft with the machine on the opposite side of the table.  The shafting was not covered or in any way protected between the two pulleys, a distance of forty inches.

During the trial ten exceptions were taken to rulings on the evidence, and the eleventh was to the ruling of the Court in granting the defendants' second prayer offered at the conclusion of the plaintiff's testimony.  The defendants offered a prayer asking the Court to instruct the jury that from the uncontradicted evidence the plaintiff by her own negligence directly contributed to the happening of the injuries and therefore their verdict must be for the defendants, and a second prayer that the plaintiff had offered no evidence legally sufficient to show any neglect on the part of the defendants as to any duty owing by them to the plaintiff, which in any way contributed to the happening of the injuries, and therefore their verdict must be in favor of the defendants.  The Court granted the second prayer, but did not act upon the first, and a verdict was accordingly rendered for the defend-

ants, on which a judgment was entered, and this appeal was taken.

We will first consider the eleventh exception and in that connection will refer to some of the others, which have relation to it. We are not prepared to say that there was no evidence legally sufficient to show any neglect on the part of the defendants as to any duty owing by them to the plaintiff which in any way contributed to the happening of the injuries for which this suit was brought. The plaintiff was one of a large number of women and girls who were employed in that factory as sewing machine operators, and there were thirty-four women and girls at the table where the plaintiff was, under which the uncovered shafting was rapidly revolving. As it was less than twenty-three inches from the edge of the table and only eight inches from the floor, it must have been near the skirts of the operatives when sitting in the position necessary to use the treadles—at least sufficiently near to make it dangerous if the skirt of one of them was moved eight or ten inches toward the shaft. The testimony shows that the skirts of some of them had at different times been caught and torn off, and at least one of the operatives was seriously injured—in the language of the plaintiff "it made a wreck out of her." Perhaps there was but little danger, if any, if the operatives always remained in the position they usually occupied, but even then a current of air might carry a skirt made of light fabric the short distance necessary to reach the shaft, a fright or some sudden movement might cause an operative to unconsciously throw her feet forward a few inches, not to speak of the fact that a fatigued girl or one with her mind on her work might thoughtlessly stretch her weary limbs beyond the safety point and her skirt be caught. Or if it be true as the evidence shows, that the small tools used by the girls were constantly being jarred off the table from the motion of the machinery, the operatives were liable to get into positions attended with

danger from a rapidly revolving shaft situated as this was. It will not do to say that if all of them always used due care there was no danger when engaged at their work, for, even if that be conceded, we know by experience and observation that there is no human being who always and under all conditions will do what they would ordinarily do if they remembered they were near dangerous places or articles.

It would therefore seem that when an employer, who is under legal obligation to furnish his employees with a reasonably safe place to work in, prepares such place for women and girls, all of whom cannot be experienced, he ought to provide against such dangers as we have spoken of, if it can be reasonably done, and he has reason to believe that they do actually exist. In this instance the defendants were not only presumed to know what might happen, but they knew before the plaintiff was injured that a number of times there were accidents by reason of this unprotected shafting. There is nothing in the testimony to show that it would be impracticable to cover the shafting between the pulleys, and there is nothing to show that it is not customary to protect it when situated as this is. In the absence of some good reason for not covering it, it does not seem to be so unreasonable or so unnecessary for the protection of the operatives to require it, as to authorize the Court to declare, as a matter of law, that the defendants were not negligent in failing to do so. Ordinary men can at least differ as to that. A rapidly revolving shaft is undoubtedly likely to do injury if one comes in contact with it, and whether the location of such a shaft, when unguarded is dangerous may depend on a variety of circumstances. The most important inquiry in determining that question is: are the operatives while in the discharge of their duties likely to come in such close contact with it as to produce injury? It was not pretended in *Gleason* v. *Suskin*, 110 Md. 137, that it was not negligence on the part of the defendants to leave the piece of the shaft which caused that

injury, unprotected—on the contrary recovery was denied the plaintiff in that case on the ground that she was guilty of contributory negligence, which presupposes negligence on the part of the defendant.

In the only other case of a suit for damages sustained by reason of injuries caused by uncovered revolving shafting in this State, *American Tobacco Co.* v. *Strickling,* 88 Md. 500, we said: "Of course, it would not be necessary under all circumstances to cover shafting. It may be so situated as to be safe and at least beyond the reach of inexperienced persons, but when shafting is so easily protected, as described by some of the witnesses, and when it is so situated that those inexperienced with its danger may be brought in contact with it in the discharge of their duties, there can be no reason why in a case of this kind the question whether the owner of the factory was guilty of the want of ordinary care, and whether it was an accident likely to occur, should not be submitted to the jury." It is true that in that case the plaintiff was a girl seventeen years of age, who was inexperienced in machinery and had never been warned of the danger, but in this case the plaintiff testified that she had never been warned of such danger as she encountered, and that she did not know that there was such danger. We will refer to that branch of the case more particularly under another head, but there is certainly testimony tending to show that there was danger from this shaft, located as it was, and such as one even of the plaintiff's experience might not be aware.

As shown by the fourth and sixth bills of exception the plaintiff attempted to prove that it was practicable to cover the shafting and what the general custom was, but the Court refused to permit the questions to be answered. In our judgment there was error in both of those rulings, but there was enough in the record even without that testimony to prevent the Court from taking the question from the jury. Why shafting eight inches from the floor, having a smooth surface

for forty inches between the sets of pulleys, could not easily and readily be covered is not shown, and it is difficult to assign any reason other than the expense why it was not. If there was, then it should be given. One of the defendants, who was called as a witness for the plaintiff, volunteered the statement that the pulleys could not be boxed in, but he did not say or suggest that the shafting could not be covered. Yet one of the experts said the most dangerous part of the machinery was on the shaft, by reason of the opposing forces from the two pulleys concentrating their action toward it at about midway between the two pulleys.

In *Gleason* v. *Suskin, supra,* sewing machines were run as they were at the Levy factory—there was a shafting under the centre of the table, eight inches from the floor, of about the diameter of that in this case. It was there shown that: "This shafting was boxed for the safety of the employes in order to prevent their skirts and clothing from catching in it." The part of it which caused the injury to that plaintiff had been uncovered for the purpose of making an extension to connect with another machine. While we cannot use the evidence in that case to show negligence on the part of these defendants, it does show that we are at least not dealing with impossibilities when we say that such a question should be submitted to the jury.

We do not mean to say that it is always negligence *per se* to leave shafting uncovered, but we do say that it was under all the circumstances of this case a question for the jury. Of the cases cited by the appellees those chiefly relied on are *Nelson-Bethel Clothing Co.* v. *Pitts.,* ———— Ky.————,. S. C. 114 S. W. 331, and *Daniels* v. *New England Cotton Yarn Co.,* 188 Mass. 260, S. C. 74 N. E. 332. In the former the shafting was arranged very much as it was in this instance, but no such question seems to have been raised as we have here—whether there was negligence in not covering the shaft. There the belt which was used to operate the ma-

chine was alleged to be defective. The plaintiff recovered a verdict in the lower Court, and as stated in the opinion: "The ground upon which the recovery was had was that the belt of the machine was not reasonably safe for use; that its defective and unsafe condition was known to the defendant, and unknown to her; and that she was assured that the belt was reasonably safe, and suitable for use, and used it not realizing that its condition was dangerous, relying upon the statements of Begley, the dangerous condition of the belt not being so manifest that a person of ordinary prudence would not have used it." Begley was the person whose duty it was, as claimed by the plaintiff, to fix the belts. The Court pointed out the fact that she knew as much about belts as Begley did, that she had often put them on, and had put the one in question on seven times the morning she was hurt, and added: "She understood that it was a part of her duty, and that she was hurt in putting it on was an accident which none of the parties anticipated, or had any reason to anticipate." The opinion concluded by saying that "Under all the evidence, the Court should have instructed the jury peremptorily to find for the defendant," but there is no reference to any negligence by reason of the shaft not being covered and, as we have seen, the plaintiff's theory was that the defective belt was the cause of the injury. There was some evidence that the plaintiff's hair was not put up and that the forelady had called her attention to her hair being down and directed her to tie it up, which she had agreed to do, but had not in fact done it, and that that was the cause of her hair being caught. She claimed that her hair was caught in one of the hooks on the belt, but without further discussing that case, it is sufficient to say that apparently the question we are now considering was not presented or passed on by that Court.

In the *Daniels case* the plaintiff wore a braid which came down to the middle of her back. The Court said: "The acci-

dent in this case evidently was caused by the plaintiff rising up from a stooping position in too close proximity to the twister, by so doing her hair was caught." The "twister" was one of the machines in use. The contention was that the plaintiff should have been warned of the danger of wearing her hair down, but the Court said there were two answers to that—in the first place the defendant had posted notices in different parts of the room in which the plaintiff worked warning the employees against wearing loose sacks, loose or flowing sleeves, "or wearing their hair flowing or in hanging braids or in long curls," and the plaintiff admitted that she had read part of the notice. The Court held that posting the notices was all that was required of the employer and he was not required to call the attention of each operative to the notices. Then it was said that there was no reason for instructing the plaintiff in regard to the danger of getting her clothes or hair against the machines or rollers, if she knew the danger, which she did. It was not shown in either of those cases that the shafting or machines could reasonably be required to be covered, and there was no point made as to the negligence of the defendants in not doing so.

Of course it is not necessary in all cases to cover shafting, and oftentimes it could not reasonably be required, but where, as in this case, it apparently can be readily done, and experience with the particular shafting had shown that it was dangerous if left uncovered we are not willing to announce as the law of this State that an employer does not owe his employes the duty of covering shafting so situated, where girls and women are, in the performance of their work, necessarily brought in such close proximity to it that they may be injured, if they happen to get a few inches closer to it than their work ordinarily requires. There may be cases where it would be unreasonable to require it or where no danger can be reasonably anticipated from it being left exposed, but to expect women and girls to give proper atten-

tion to their work and at the same time have their minds
constantly on the shafting which is so near their feet that
any unusual movement by them of a few inches may result
in their skirts being caught and themselves being injured is,
to say the least, demanding more care and prudence of such
operatives than can ordinarily be expected.   It is true that
the shafting is in one sense protected by the table, but it is
equally true that the mere fact that it is out of sight and to
some extent must be out of mind of the operative who has
her thoughts on her work, increases the danger, and if it is
practicable to cover the greater part of the space between the
pulleys it is not unreasonable to so require of the employer,
one of whose important duties is to provide his employes
with a reasonably safe place to work in.

In this connection we will consider the question of as-
sumed risk relied on by the appellees.  As was said in *B. &
O. R. R. Co.* v. *Baugh,* 149 U. S. 368, which this Court has
several times quoted with approval: "It is the master who is
to provide the place and the tools and machinery, and when
he employs one to enter into his service he impliedly says to
him that there is no other danger in the place, the tools and
machinery than such as is obvious and necessary."   In *Wood*
v. *Heiges,* 83 Md. 268, after speaking of the risk which the
servant assumes, when he enters the employ of a master, it
is said: "Where, however, the risks to which the servant is
subjected are such as he had no reason to believe, from the
nature of his employment, he would have to encounter, and
such risk arise from causes hidden or secret, or such as
would reasonably escape his observation, the master is bound
to notify his servant, provided he himself knew or by the
exercise of ordinary care ought to have known of them."
Again, it was said in *Eckhardt* v. *Lazaretto Co.,* 90 Md. 188,
that "When the occupation carried on is in its nature so ex-
tra-hazardous as to be dangerous to human life or health, both
justice and humanity require that the employer should take

all reasonable and needed precautions to secure safety to the employes, and make clearly known to them the inherent dangers of the service, and should especially acquaint them with such risks as are ascertainable only through a knowledge of scientific facts, which an uneducated man is not presumed to know."

In *Yates* v. *McCullough Iron Co.,* 69 Md. 370, this Court, after speaking of the risks which the servant assumes, said: "It may be assumed that this rule applies only to patent or obvious defects, such as persons of ordinary care would be likely to discover, and that the servant is not bound to inspect the appliances to see whether or not there are *latent* defects that render their use more than ordinarily dangerous, but is only required to ascertain such defects or hazards as are obvious to the senses, 2 *Wood's Master and Servant* (2nd Ed.), sec. 376. Hence in cases where knowledge of the defects does not necessarily carry with it knowledge of the resulting danger, it may be proper for the Court to instruct the jury as requested in the plaintiff's second prayer." That prayer asked the Court to instruct the jury that if they found that the machinery in question was, owing to some defect in it or in the building in which it was placed, unsafe and dangerous, by reason of the negligence of the defendant, "Then in order to establish that the plaintiff assumed the risks involved in using it, it is not sufficient to show that the machinery was defective, and that such defect was known to the plaintiff, but it *must appear* that the *danger* was known to him as well as the defect which caused the danger, or that by reasonable care on his part it would have been known to him."

Now without quoting further from other cases, let us apply the doctrine to be found in these decisions to the facts in this case. It may be admitted that owing to the age and experience of the plaintiff she would be held to assume such risks as were the result of coming in contact with the shaft-

ing, if she had been injured by her clothing being caught in the shafting while she was engaged in her work, or if she had touched it with her head or hair, or had gotten so close to it that she would be presumed to know it would attract her hair and injure her, but she denied positively that she had knowledge of such powers of attraction as was proven in this case to exist, if the plaintiff's testimony is correct. She said: "I knew it was dangerous to touch it but I did not think for a minute that it was dangerous when you were away from it, that it would get you like it got me." She was also asked: "How close did you think you could come to it with safety," and replied: "I never considered that at all." According to her testimony she did not place her head closer to the shaft than something like ten inches. It cannot be said to be a matter of common knowledge that shafting such as this could attract human hair, or other light substance, such a distance as was testified to by the experts in this case. Indeed it would likely be questioned by those presumably much better informed on such subjects than the plaintiff, in the absence at least of testimony of those of scientific knowledge equal to that of the experts who testified. But the experts were positive as to the effects of the forces spoken of, and the plaintiff was equally positive as to the distance she was from the shaft. Assuming their testimony to be true, as we must as the case is presented, can it be possible that the law has so little regard for the thousands and tens of thousands of employes whose lives, limbs and health are in a large measure dependent upon the proper discharge of the duties which their employers owe them, as to declare that although the master is negligent the servant cannot hold him responsible for injury sustained by reason of that negligence, because the servant has assumed risks which he never dreamed existed? A servant may know his master is sick and may attend him believing he has chicken-pox. If in point of fact he has small-pox, and the master knew he had, does the servant assume all risks from small-pox because he knew the

master was sick? A servant may enter the service of a master in some excavation which he knew was dangerous by reason of obvious conditions, but does he assume the risk of being blown up by dynamite which the master knows had been left in the place to be excavated, although the servant did not know it or have any reason to suspect it? And in this case the servant knew that the unprotected shaft was dangerous if she touched it, but she did not know, according to her testimony, that the pulleys and shafting had the power of attracting hair and other light substances ten or more inches. It is possible that the defendants did not know the extent to which the powers spoken of might be exerted, but if they did not they should at least be required to explain that they did not and why they did not. They had the shafting put in position, and they ought either to know all dangers which could reasonably be anticipated as the result of it being left unprotected, or give some satisfactory reason for not knowing them. But if they did not know or could not be expected to have known that there was danger of such injury being done as the plaintiff suffered, surely she cannot be said to have assumed such risk, for there is nothing to suggest that she knew more than they did. The doctrine of assumed risk, while well established in this State, is one that ought not be extended so far as to relieve an employer of his negligence on the theory that because the employee knew there was danger, if she came in contact with a part of the machinery which made it so, she assumed all risks from it, even if she kept away from it a distance which she supposed and had the right to suppose, in the absence of some warning, was perfectly safe. The doctrine is sought to be applied so as to excuse negligence in this case, for if there was no negligence on the part of the appellees there is no occasion to rely on the doctrine of assumed risk, and hence we say that it should be limited to risks which are obvious, and can be understood by an employee of ordinary intelligence, or at most to those which should be anticipated

by the employee, as the result of conditions which are obvious, or can reasonably be expected to be known by him.

Nor do we think the evidence shows such contributory negligence on the part of the appellant as to justify us in saying, as a matter of law, that she cannot for that reason recover. It may be true, as suggested by the appellees, that she actually touched the shafting, but that is not what she swore to, and according to her expert testimony her hair might have been drawn to the shafting, even if it were farther from it than she says it was. It may be that she could have borrowed a needle wrench from another operative, or could have run a stick under the treadle, to see if the wrench was there, but if she had no reason to fear any danger, from doing what she did, it cannot be said that she was guilty of contributory negligence because she did not adopt one of those plans. She needed the wrench in her work, and according to her testimony was responsible to the appellees for it if she lost it.

This case differs materially from that of *Gleason* v. *Suskin, supra*. That appellant was perfectly aware of the danger of the shafting, and of coming in contact with it, which she evidently did, but she took a position in a narrow space about thirty-five by sixteen and one-half inches, turned her back towards the shafting and without any reason placed herself very near it, although she knew it to be dangerous if her dress came in contact with it. The expert testimony showed that her dress must have been as near as one-half inch to the shafting, otherwise the accident could not have occurred, according to those witnesses, unless her dress was frayed, of which there was no evidence. The testimony failed to show that it was either necessary or even more convenient for her to take the position she did. Under those circumstances it was a clear case of contributory negligence, but here according to the evidence the conditions were altogether different.

We are of the opinion therefore that the case presented by the record was one which should have been submitted to the jury by appropriate instructions as to the negligence of the defendants (whether or not leaving the shafting unguarded was negligence), as to the assumed risks of the plaintiff and as to her contributory negligence.

We find no reversible error in the first and second exceptions as such questions could have done no possible harm. There was no error in the ruling in the third bill of exceptions. In answer to the question as to what extent the pulleys were boxed the witness said they were not boxed in, "you could not box them in." That was a very natural answer, if such was the fact, and the plaintiff had no cause to complain of it. We have already said that there was error in refusing to allow the questions in the fourth and sixth bills of exception to be answered. There was no error in striking out the testimony objected to in the fifth. The witness was not familiar with factories such as that of the appellees in Baltimore, but the question was limited to those in that city. We think the questions in the seventh, eighth, ninth and tenth bills of exception were admissible. It was proper to prove whether the forces and effects spoken of by the experts were of a character generally known to untrained persons, as reflecting upon the questions of assumed risk and contributory negligence.

For errors in granting the second prayer of the defendants, and in the rulings in the fourth, sixth, seventh, eighth, ninth and tenth bills of exception, the judgment must be reversed.

> *Judgment reversed, and new trial awarded, the appellees to pay the costs above and below.*