# STATE, USE OF NITZA E. KALIVES ET AL. *v.* BALTI-MORE EYE, EAR, AND THROAT HOSPITAL, INC., ET AL.

[No. 1, January Term, 1940.]

518

*Decided January 24th, 1940.*

The cause was argued before BOND, C. J., SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*Charles H. Medders,* for the appellant.

*William D. Macmillan* and *James U. Dennis,* with whom was *Harold Tschudi* on the brief, for the appellees.

MITCHELL, J., delivered the opinion of the Court.

The appeal in this case is from a judgment on a

directed verdict in favor of the appellees, defendants below, in a suit for wrongful death based upon alleged negligence and malpractice on the part of the defendants.

The declaration, as amended, alleges that the equitable plaintiffs, respectively, are the widow and son of Angelo Kalives, late of Baltimore City, who, on July 16th, 1937, arranged with Dr. Lee Cohen, a practicing physician of said city, for the removal of his tonsils and the turbinated bones of his nose; that both patient and his family were assured that the contemplated operation was free from danger of any kind and that the patient would be able after the operation to return to his home in two or three days, a perfectly well man, that, upon the advice of the doctor, he entered the Baltimore Eye, Ear and Throat Hospital at 9:45 A. M., where he was received, forthwith given anesthetics, and otherwise prepared for the operation, which was performed between the hours of 2 and 5 o'clock P. M. on the same day he entered the institution. It is then set forth that at the time fixed for the operation Dr. Cohen, Dr. Phillip Kaufman, a resident physician at the hospital, Margaret M. Walker, an anesthetist, and Rachel Yingling, an instrument nurse, who, together with said hospital, a body corporate, comprise the defendants herein, caused the patient to be taken to the operating room of said hospital, and there performed four major surgical operations on his nose and three on his throat; that four stitches were put in the nose and five were put in the throat membrane; that they packed the nose so tightly with compressed cotton that air could not pass in or out therefrom; that ether was administered to said patient during the course of the operation, and that an ether tube was left untied in the mouth of the patient when he was returned to his room in the hospital in an unconscious and helpless condition. In this connection it is alleged that it was a duty that Dr. Cohen owed to said patient to see that the tube in his mouth could do no harm to him, and that the said Dr. Cohen did not use due care; that Dr. Kaufman, a resident physician of said hospital, assisted at said operation and it was his

duty to see that the patient was kept free from danger and to tie the ether tube in his mouth, which duty he did not perform and that he did not use due care; that Margaret M. Walker, the anesthetist and assistant in said operation, allowed the ether tube to remain untied in the mouth of the patient and did not return it to the instrument nurse, whereby she also failed to use due care; and that Rachel Yingling, the instrument nurse, assisted in said operation and, through her failure to recover the ether tube from the anesthetist, it was permitted to remain in the mouth of the patient untied when he was sent to his room, she also failing to use due care.

For the reasons above stated, it is thereupon alleged that Dr. Cohen and the remaining defendants, as agents, servants, and employees of the said Cohen and of the said hospital, suffered and permitted said ether tube then and there in the throat and mouth of the patient to become out of place and position in which it was used to control the tongue, and "allowed the blood, serum and mucous to run down into the windpipe, clot and stop the air from passing to the lungs and killed the said Angelo Kalives," it being further alleged that the patient was allowed to remain in a dark room unattended; that at 7:30 P. M. he was found struggling and gasping for breath, the tube being then removed from his mouth, and that he died less than two hours later.

To the aforegoing declaration the general issue plea was interposed on behalf of all of the several defendants, and, in addition thereto, the corporate defendant filed a special plea setting forth its incorporation as an eleemosynary institution organized solely for charitable purposes; its property and assets of every description as being held in trust for such purposes; and that it was not being operated for the profit of any stockholder or other person. As to the latter plea, a replication was filed denying that the corporate defendant was an eleemosynary institution with respect to the equitable plaintiffs, and submitting that the deceased was a pay patient in said defendant hospital. Issue was joined on the remaining pleas.

During the trial of the case four exceptions were reserved by the equitable plaintiffs, the first three being directed to rulings upon evidence by the trial court, and the last to its rulings upon the several prayers, submitted by the defendants at the close of the plaintiff's case, for a directed verdict in their favor, upon the ground that no evidence legally sufficient to entitle the equitable plaintiff's to recover had been offered.

Considering the above exceptions in their order, we find the record as to the first exception somewhat confusing. Mrs Kalives, the widow, upon being called as a witness by her counsel, was permitted without objection to testify to the effect that, shortly before the operation was performed, she was assured by Dr. Cohen that there was no "danger at all" to be anticipated in its performance, and a receipt for eighty dollars paid the doctor for or on account of his services was admitted. She then testified that, after the operation was performed, at about 5 o'clock in the afternoon, she went to her husband's room in the hospital, found him sleeping, with "something silver, round, and it had a round hole in the middle," in his mouth; that she was told by the doctor: "Don't worry, he is all right." * * * "He is fine, you go home to rest now." She was then asked: "was the tube tied in his throat—in his mouth?" A. "No." The record shows that no objection was made to the question until after it had been answered by the witness, and while counsel for the appellees in their brief suggest that it was answered before they had time in which to object, no such reason is shown by the record, and no motion was made that the answer be stricken out. *Jones on Evidence* (3rd Ed.), sec. 893.

Then appears in the record the following excerpt. "The Court: Sustain the objection as to all of the defendants except Dr. Cohen, * * * the private arrangement her husband had with Dr. Cohen, * * * but that testimony would not be admissible against the hospital, the assistant surgeon, and the nurse and the anesthetist." From the aforegoing remark it is difficult to discern what the

trial court had in mind at the time the ruling was made. However, the court appears to have sustained the objection as to all defendants other than Dr. Cohen, although it was argued by the appellees that the objection should have been sustained as to all of the defendants, (a) because the question was of a technical nature and submitted to the witness an inquiry as to which she was not qualified to answer, and (b) because there had been no prior evidence offered tending to show that the tube referred to in the question should have been tied. In our opinion, neither objection was well founded. The witness was not asked to express any opinion as to the effect an untied tube in the throat or mouth of the patient would have upon him. She had previously detailed what she had actually seen in her husband's mouth, and the description she gave of what she had seen would indicate that it was what her counsel in propounding the question termed to be a "tube." Whether what she saw was tied or loose in her husband's mouth was a question of fact, and we can see no plausible reason why, under the circumstances to which she had previously testified, the question was not one properly submitted to her. Had the question been followed up by the testimony of technical or expert witnesses tending to show the efficacy of tying the tube in the patient's mouth while he was under the influence of an anesthetic, the query whether the tube was or was not tied might have had an important bearing upon the final determination of the case. But, as far as our examination goes, we find no testimony in the record tending to show what effect upon a patient would result from a failure to make such a tube in his mouth stationary; and, assuming that there was error in the court's ruling upon the question, for the reasons stated, it does not appear that the equitable plaintiffs were injured thereby. There must be injury as well as error to authorize a reversal. *Pratt v. Johnson*, 6 Md. 397; *United Rys. & Electric Co. v. Dean,* 117 Md. 686, 702, 84 A. 75; *Dettering v. Levy,* 114 Md. 273, 279, 79 A. 476; *Swindell Bros. v. J. L. Gilbert & Bros.,* 100 Md. 399, 60 A. 102;

*Chesapeake & Potomac Tel. Co. v. Carey,* 124 Md. 527, 93 A. 11; *American Express Co. v. Terry,* 126 Md. 254, 94 A. 1026.

The second exception is raised to the action of the trial court in sustaining an objection to the following question asked the witness Odessa Ferlipedes: "Did he, (referring to the deceased), borrow money from you to have this operation done?"

The objection was sustained, and the witness having meanwhile answered the question in the affirmative, the court ordered the answer stricken out. We find no error in this ruling: (a) because such transaction as was indicated by the question was not relevant to the subject of inquiry; and (b) assuming its relevancy for the purpose of establishing the fact that Dr. Cohen received compensation for his services, that fact had previously been admitted. Furthermore, it was entirely immaterial as to the source from which Mr. Kalives realized the money for the purpose of the operation.

The third exception resulted from the ruling of the court in sustaining objection to a hypothetical question which counsel for the equitable plaintiffs, after qualifying as a medical expert, propounded to himself as follows: "Q. Suppose that a strong, vigorous man, of about forty-seven years of age, after an operation on his head, nose and throat, turbinated bodies removed from his nose, stitches put in his nose, both turbinates, the middle and inferior turbinated bones, and three stitches put in the membranes; the nose was packed with compressed cotton; that both tonsils were removed, and two stitches put in the base of each tonsil, that the uvula was removed and a catgut suture put in the uvula, that after the operation the ether tube was left in his mouth and that from 2 to 5 o'clock the operation took place, and after the operation the man was found in a dark room, fighting for breath and air from 7 o'clock until 9, and about that time he died, would a blood clot in the lung cause the man to fight for air to breathe and die?"

Before passing upon the above exception, it should be noted that at the time the question was propounded, no evidence whatever had been offered tending to show that the deceased at the time of the performance of the operation was a strong, vigorous man, and none had been offered as to the extent of the operation and manner in which it was performed, as set forth in the question. However, previous to this stage of the testimony, Dr. Manuel G. Geichner, who performed an autopsy upon the body of Kalives, testified, in support of his prior *post mortem* report of the case, that the cause of death was a pulmonary embolism of the left upper lobe of the lung, with an infarct of the same upper lobe. He further testified that embolism and a blood clot were synonymous terms, and, upon being asked a hypothetical question practically similar to the question now under consideration, in that it was almost entirely based upon an assumption of facts conspicuously absent from the record, definitely testified that a clot lodging in the lung was "frequently fatal." It is obvious that the question now under discussion was asked for the purpose of contradicting the plaintiffs' own witness, Dr. Geichner; but facts assumed and not proven, as set forth in the hypothetical question asked Dr. Geichner, assuredly cannot justify a second, similar, question, in the absence of proof, to be asked another expert, when, as in the latter instance, objection to the question is interposed. In *Jones on Evidence* (3rd Ed.), sec. 370, it is said: "While it is impossible to lay down any unyielding rule as to the form of the hypothetical question in such cases, it is clear that the question should be so framed as to fairly and clearly present the state of facts which the counsel claims to be proved, and which the testimony on his part tends to prove." And in section 371 of the same authority it is further stated: "If there is no testimony in the case tending to prove the facts assumed in the hypothetical question, such question is improper."

To the same effect, in the case of *Quimby v. Greenhawk*, 166 Md. 335, 171 A. 59, 61, Judge Parke observed that: "It has been the practice in this jurisdiction for

some years to permit an expert to express his opinion upon facts in the evidence which he has heard or read, upon the assumption that these facts are true." See *Jerry, a Negro v. Townshend,* 9 Md. 145; *Baltimore City Pass. Ry. Co. v. Tanner,* 90 Md. 315, 45 A. 188; *Berry Will Case,* 93 Md. 560, 49 A. 401; *Owings v. Dayhoff,* 159 Md. 403, 151 A. 240; *Baltimore City v. State,* 122 Md. 113, 103 A. 426; *Rickards v. State,* 129 Md. 184, 98 A. 525; *Daugherty v. Robinson,* 143 Md. 259, 122 A. 124; *Gordon v. Opalecky,* 152 Md. 536, 137 A. 299; *Balto. & O. R. Co. v. Brooks,* 158 Md. 149, 148 A. 276.

In other words, while it is clear that an expert witness may be asked an opinion upon a state of facts, hypothetically put, it is equally clear that the facts submitted must be based upon evidence, and if no evidence has been adduced to support the hypothesis of the question, an objection to it should be sustained. *Miller v. Leib,* 109 Md. 414, 72 A. 466; *Williams v. State,* 64 Md. 384, 1 A. 887; *United Rys. & Elec. Co. v. Seymour,* 92 Md. 425, 431, 48 A. 850.

It was shown that Kalives consulted Dr. Cohen, that upon the latter's advice he entered the hospital conducted by the corporate defendant, that he was operated upon on the date he entered the institution, some time between the hours of 2 and 5 o'clock P. M., that at about 7 o'clock his condition became alarming and that he died two hours later, the cause of death, as developed by an autopsy, being a pulmonary embolism of the left upper lobe of the lung with an infarct of the same upper lobe.

Dr. Cornelius Ham, a coroner of the City of Baltimore, at the instance of the equitable plaintiffs, testified that he was present at the autopsy and saw the embolism, and that he signed the death certificate of Mr. Kalives, stating the cause of death to have been an "infarct and embolism of the upper lobe of the left lung." Referring to the patient, he was subsequently asked the following question and gave the following answer: "Q. Would an embolism in his lung produce this symptom of fighting for air to breathe, kicking his feet, and throwing his

hands in the air, and strangling for air to breathe? A. Yes."

The only evidence in the record which tends to show that the patient suffered from oppression is that of Daniel P. Hinkling, Jr., who testified that he visited the former's room about 7 o'clock and found him "fighting for his breath, and his hands in a frantic way." This witness also testified that he found Kalives then gasping and making incoherent sounds, such as "ah, ah," and, further, that at that time there was no attendant immediately in the patient's room.

As far as our examination of the record goes, there is no evidence in the same tending to prove any act of negligence as alleged, on the part of the defendants, acting either collectively or in their separate capacities.

In the case of *State, use of Janney v. Housekeeper,* 70 Md. 162, 16 A. 382, 384, it was said: "It was the duty of the professional men to exercise ordinary care and skill, and, this being a duty imposed by law, it will be presumed that the operation was carefully and skillfully performed, in the absence of proof to the contrary. As all persons are presumed to have duly performed any duty imposed on them, negligence cannot be presumed, but must be affirmatively proved. *Best on Presumptions* 68; *Jacksonville St. Ry. Co. v. Chappell,* 21 Fla. 175, 1 So. 10. This principle is especially applicable in suits against physicians and surgeons for injuries sustained by reason of alleged unskillful and careless treatment. The burden of proof is on the plaintiff to show a want of proper knowledge and skill. *Leighton v. Sargent,* 31 N. H. 119; *Baird v. Morford,* 29 Iowa 531. See *Street v. Hodgson,* 139 Md. 137, 115 A. 27; *McClees v. Cohen,* 158 Md. 60, 148 A. 124; *Fink v. Steele,* 166 Md. 354, 171 A. 49.

Before the equitable plaintiffs can recover against any of the defendants, it must be shown by affirmative evidence that they were either unskilled or negligent in their respective capacities, and that such want of skill or care resulted in the death of Mr. Kalives. If either of the above elements is lacking in the proof, then no case for

the consideration of the jury has been presented. More-over: "To constitute actionable negligence, there must be not only causal connection between the negligence complained of and the injury suffered, but the connection must be by a natural and unbroken sequence, without intervening efficient causes, so that, but for the negligence of the defendants, the injury would not have occurred. It must not only be a cause, but it must be the proximate cause." 22 *R. C. L.*, 113, *Proximate Cause*, sec. 3. The evidence adduced in the instant case points to no specific act of negligence on the part of any one of the several defendants. Negligence, if any, therefore, must be imputed from the fact that the patient was found gasping for breath, without an attendant or nurse in actual attendance in his sick room at that instant. And there is no evidence in the record that, in the absence of the employment by him of a special nurse or attendant, it was incumbent upon any of the defendants to see that an attendant was at his bedside at all times. On the other hand, affirmative testimony showing the proximate cause of the death of an unfortunate patient is definitely in the record, at the instance of the equitable plaintiffs, and not through any activity of the defendants.

In our opinion, there must be something more than a showing that the evidence might be consistent with the plaintiff's theory of the cause of death. It must be such as to make that theory reasonably probable, not merely possible, and more probable than any other hypothesis based on such evidence. In brief, the evidence must justify an inference that the death in the instant case resulted from the negligence of the defendants, or at least some one or more of them, rather than from some other cause. And for these reasons it is our conclusion that the ruling of the lower court, in granting directed verdicts with respect to each of the several defendants, as raised by the fourth and final exception, was without error.

*Judgment affirmed, with costs to the appellees.*